**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-CV-03252-CNS-SBP

JASON AARON PRESCOT, individually
and as Next Friend of J.R.P., and J.E.P.,
minors.

   Plaintiffs,

   v.

RICHARD VALDEZ, individually and in
his official capacity as Sheriff of Archuleta
County, Colorado; JAMES MARTINEZ,
individually and in his official capacity as
Deputy Sheriff of Archuleta County,
Colorado; DEREK WOODMAN,
individually and in his official capacity as
Undersheriff of Archuleta County,
Colorado; WARREN BROWN, and in his
official capacity as Operations
Commander in the Archuleta County
Sheriff's Office; MICHAEL SINDELAR,
individually and in his official capacity as
a Deputy Sheriff in the Archuleta County
Sheriff's Office; JOHN DOES 1-5, whose
actual names are unknown as yet to the
Plaintiff; JANE DOES 1-5, whose actual
names are unknown as yet to the Plaintiff

   Defendants.

---

**PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE**

---

   Plaintiffs, by their attorneys, hereby move this Court for sanctions against

Defendants pursuant to F.R.Civ.P. 37 (e) for spoliation of critical electronic evidence and

as grounds therefor would show the Court the following:

1.    Lisa  Ward of the undersigned's law firm has conferred with opposing counsel regarding this motion and it is opposed.

2.    This motion for sanctions is based upon the intentional destruction of critical text messages between Defendant Deputy James Martinez and Plaintiff Jason Prescott's then wife, Erika Prescott, which text messages gave rise to and were part of the tortious conduct of Defendants in this case. This destruction of evidence occurred after Defendants were on notice of the materiality of the evidence, after the Plaintiff Jason Prescott was falsely arrested and actually in custody, and after multiple formal demands for its preservation.

3.    This spoliation of such critical evidence by these law enforcement Defendants is so egregious and so prejudicial to the Plaintiffs that the only curative sanction is entry of default judgment on liability against the Defendants. In the alternative, at the very least, the jury must be instructed that it must presume the information was unfavorable to the Defendants.

## I.

## Relevant Facts

4.    This case began with an inappropriate relationship between Archuleta County Sheriff's Deputy James Martinez and Plaintiff Jason Prescott's then-wife, Erika Prescott, and culminated in the wrongful arrest of Jason Prescott in the middle of the night on December 3, 2020, in front of his two young children, for an alleged "cold" DV[1] involving

---

[1] An allegation of an incident falling within the broad category of "domestic violence"

allegations against Mr. Prescott, none of which were alleged to involve physical contact by Jason Prescott against Erika Prescott. The Archuleta County Sheriff's Office (hereafter "ACSO") ensured that Mr. Prescott would be arrested in the most violent and dangerous manner possible for these alleged non-physical misdemeanors. The arrest occurred after the ACSO entered into CCIC[2], that Mr. Prescott was armed and dangerous and had kidnapped his children, all of which was completely false information and known by ACSO to be false. *See* Exhibits 1, 2 and 3.

5.    The key to why the Sheriff's Office took these extraordinary measures to effect the arrest of Mr. Prescott in the middle of the night is the series of text messages between Erika Prescott and Deputy Sheriff James Martinez over the course of several days leading up to Mr. Prescott's arrest. Those text messages were intentionally destroyed by the law enforcement defendants, including Defendant Martinez, all of whom knew they had a duty to preserve them as evidence, both for purposes of the criminal case and for purposes of the claims in this case.

6.    Partial copies of some of the texts exist, but only in the form of a video made by Mr. Prescott while scrolling through a portion of the texts on November 29, 2020, so Plaintiffs only have a portion of the texts *through November 29, 2020*, which is three days before Erika Prescott went to the ACSO office to attempt to have Jason Prescott arrested and four days before he was actually arrested on December 3, 2020. Moreover, many of

---

occurring sometime in the past.
[2] The Colorado Crime Information Center, is a telecommunications network and record system maintained by the Colorado Bureau of Investigation (CBI). CCIC enables law enforcement agencies to communicate with each other within and outside of Colorado, facilitating information sharing about crimes and criminal records.

the texts that were recorded are incomplete or not legible. The critical texts from November 29, the time Erika Prescott and Deputy Martinez decided to seek the arrest of Jason Prescott, through the day he was arrested (and thereafter) are missing, **and they were intentionally destroyed by Defendant Deputy Martinez with the complicity of the other Defendants**.

7.    Because of the intentional destruction of the text exchanges after November 29, 2020, Mr. Prescott has been denied the opportunity to present this evidence to the jury to prove precisely how Deputy Martinez facilitated the unlawful arrest of Mr. Prescott, how Deputy Martinez was coaching Mrs. Prescott on what to say to the other ACSO actors to have Mr. Prescott arrested, and what Deputy Martinez agreed with Mrs. Prescott he personally would do to assure that the scheme to have Mr. Prescott arrested would be successful. What we do know, and what the record developed during discovery establishes, is that Deputy Martinez was working to get Mr. Prescott arrested, to the point of coaching Mrs. Prescott to "provoke" Mr. Prescott so he would become aggressive or violent and record him, advice no law enforcement officer would ever give if he thought the person could be a victim of actual domestic violence. This was purely to attempt to "set up" Mr. Prescott to have him arrested. We also know that the manner in which the ACSO pursued Mr. Prescott for claims of non-physical misdemeanors was egregious and beyond the pale, which is explained by this inappropriate relationship between Deputy Martinez and Mrs. Prescott.

8.    Indeed, this inappropriate relationship between Deputy Martinez and Mr. Prescott's wife was the catalyst moving Mrs. Prescott to make a false complaint to ACSO

moving it and Defendants into unprecedented action against Jason Prescott, for what, even if true, could have been nothing more than non-physical misdemeanors. Defendants' actions included warrantless pinging of Mr. Prescott's phone in violation of his constitutional rights, and setting up Mr. Prescott for a "felony stop" arrest, the most dangerous type of arrest, for the three alleged non-physical misdemeanors, all the while ignoring all of the exculpatory evidence the Defendants had in their position at that very moment. *See* Exhibits 1, 2 and 3, highlighted portions.

9.    At that time, in early December 2020, Jason and Erika Prescott had a pending open divorce case in Florida. It was pending throughout the time they were living in Pagosa Springs, Colorado, from September 2020 through the time Mr. Prescott was arrested in Colorado Springs in the middle of the night on December 3, 2020; however, the Colorado Springs police officers refused to turn the children over to Mrs. Prescott, despite the Amber Alert, due to her having restricted parenting time by Court Order, so they canceled the Amber Alert and left the children with Mr. Prescott's close friends. Exhibit 4, pp. 5, 6, 12; Exhibit 5, which is both Florida Court Orders; *See Also* Exhibit 6, which is a transcript from the Florida proceedings the morning after Mr. Prescott was arrested where the Judge admonishes Mrs. Prescott's counsel that the Order restricting Mrs. Prescott's parenting time was still in place and still the Order of the Court, at p. 16-19.

10.   In Florida, Mrs. Prescott had previously called the police on Jason Prescott, alleging domestic violence against him and had him arrested in front of the parties' children. The Florida court, however, found that Mrs. Prescott had disconnected all of the

video cameras from the home, and then went outside near an outdoor security camera

which only had audio, and then screamed as if she were being attacked, essentially

fabricating "evidence" of an attack. *See* Exhibit 7, which is the Florida Court Order, at p.

ARCP000637. There was video presented of her disconnecting all of the cameras

approximately one hour prior to her allegations and the arrest of Mr. Prescott, and the only

voice on the audio recording was Mrs. Prescott's. *Id*. Thus, as a result of the Court's

finding that Mrs. Prescott essentially faked a domestic violence incident in order to frame

Mr. Prescott and have him arrested, combined with the fact that Mrs. Prescott did this

while the children were in the home, the Court restricted Mrs. Prescott's parenting time to

supervised parenting time only and placed the children in Mr. Prescott's sole custody.

Exhibit 5. That restriction order was still in place on December 2, 2020, and was provided

to Defendants on that date when it was understood that Mrs. Prescott was working with

her Deputy boyfriend, James Martinez, to have Mr. Prescott arrested. Exhibit 8.

        11.    The Prescotts had begun a reconciliation attempt and began residing in

Archuleta County, Colorado at the end of September 2020. *See* Exhibit 6, pp. 8-13**.** On

November 29, 2020, Jason Prescott saw on Mrs. Prescott's phone, which was left sitting

out and open, text messages between his wife and a man named "James." Mr. Prescott

scrolled through the texts and discovered that "James" was a law enforcement officer. The

text messages were alarming, as described below, and Mr. Prescott hastily made a video

recording of them as he scrolled through them. Mr. Prescott was arrested 3 days later.

        12.    As noted previously, all texts after that November 29 date were deleted by

Deputy Martinez, apparently on December 10, 2020, when the DA Investigator called

James Martinez to obtain the texts. Exhibit 9, p. 2.; *See Also* Exhibit 10, which is an audio recording of this DA Investigator interview of James Martinez, which will be submitted under separate cover. The other Defendants were complicit in this spoliation of evidence, in that even though they were aware of the texts' existence and materiality and were aware of the necessity of providing those texts in the course of the criminal case against Mr. Prescott, and were aware of their duty to preserve the texts at all times from December 2, 2020 on, they took absolutely no steps to secure and preserve them and did nothing to retrieve the texts once Deputy Martinez revealed that he destroyed the texts, nor was Deputy Martinez admonished or reprimanded in any way for destroying this evidence in a criminal case and evidence which was demanded to be preserved repeatedly.

13.   The destruction of the text messages between Deputy Martinez and Erika Prescott, which were evidence in the criminal case against Mr. Prescott at the time they were destroyed, and which are critical evidence in this case, has deprived Mr. Prescott of the ability to introduce this damning evidence in this case in proof of Defendants' culpability. As such, the only remedy is default judgment on liability against Defendants. At the very least, the jury must be instructed that it must presume the information was unfavorable to the Defendants.

## II.

### The Known Text Messages That Do Exist Are Damning for the Defendants

14.   As noted above, there is a low quality video of some of the text messages, but they are not all legible and the text messages only go through November 29, 2020,

three days before Mrs. Prescott went to the Sheriff's Office to once again attempt to have Mr. Prescott arrested on false charges. However, the legible messages that do exist are damning for the Defendants.

15.   Initially the texts were just overly friendly, with "good morning" and talks about their moods and their hobbies, but over a short time became very personal. The overall picture is that of a budding romantic relationship. And it was a relationship completely unknown to Jason Prescott. As the relationship became closer as evidenced by the messages that do exist, Deputy Martinez gave Mrs. Prescott advice when she was given a ticket that it was "fine" to run a stop sign, "but pay attention so no police are around," not normal advice from a law enforcement officer to a citizen in the community. Exhibit 11, p. 20.

16.   Soon it was becoming more intimate, with comments from Defendant Martinez such as not to "make it a habit" to not say hello to him and Mrs. Prescott responding "I couldn't", and "save me some" from his Thanksgiving dinner. Exhibit 11, pp. 44-50; pp. 66-69. Soon Erika Prescott was asking to meet and Deputy Martinez responded, "I'm free always. I make time." Exhibit 11, pp. 71-72. Then, on November 26, 2020, Deputy Martinez asked Mrs. Prescott if she dressed up for Thanksgiving (which was that day) and Mrs. Prescott sent him a picture with the comment, "**Sorry it's a lot of boob**" and the response from Deputy Martinez was, "**Don't be, stunning to say the least**." Exhibit 11, pp. 72-75 (emphasis added). **Then Mrs. Prescott immediately asked Deputy Martinez to call her**. Exhibit 11, p. 76.

17.   The next day, on November 27, 2020, Mrs. Prescott asked Deputy Martinez if

her husband had "submitted something to the police" and Deputy Martinez responded that Mr. Prescott had not and "I promise, it's intimidation method." Exhibit 11, p. 76. Then Deputy Martinez told Mrs. Prescott that he wanted to check on her and she gave him the address of her and Mr. Prescott's home. Exhibit 11, p. 77.

18.   Then, on Friday, November 27, 2020, Mrs. Prescott texted Deputy Martinez that Mr. Prescott "recked [sic] my house and now wants me to clean it, he takes videos and says I am a bad mom." Exhibit 11, p. 78. Mrs. Prescott then texted Deputy Martinez, "I need to get out of this." Deputy Martinez responded, "I could not agree more." Exhibit 11, pp. 79-81. Mrs. Prescott went on to explain to Deputy Martinez that she was not a Colorado resident yet so "I have to figure out **how** I can proceed….**I'll figure it out**," clearly soliciting the Deputy's help in removing her husband. Exhibit 11, pp. 81-82 (emphasis added). Ms. Prescott said she had to live "here for x amount of time…90 consecutive days." She then told him the exact count, that November 30th will be 60 days and she then had one more month to go. Exhibit 11, pp. 83-85. Deputy Martinez responded, "Dang, I met you freshly here," obviously aware of the date they met. *Id*. Mrs. Prescott replied that she came to Colorado the Sunday before they met, saying, "Yeah because **I think we met on a Friday. I'm glad I did**." Exhibit 11, p. 85-88 (emphasis added). Deputy Martinez responded, "**Me too…You're a great woman**." *Id*. (emphasis added). He then asked Mrs. Prescott, "What's your plan?" Mrs. Prescott responded that she did not have one and that she just realized she needs one. Exhibit 11, p. 88-93.

19.   The next texts are not completely legible, but it is clear they are talking about Mrs. Prescott moving into Deputy Martinez's home when Mrs. Prescott writes in the part

that can be read, "tell me about it…can afford it I am in!" *Id.* Deputy Martinez replied that it is "almost done. Just finishing floors and counters…I'm hoping the beginning of the year." Mrs. Prescott responded, "**Perfect….I will def have to move….Beginning of the year might be great timing**" (emphasis added). *Id.*

20.   When questioned in his deposition about Deputy Martinez and Erika Prescott talking about moving in together, Deputy Martinez testified that he did not "recall" that "[b]ut the exchange could imply that, I would say." *See* Exhibit 12, p. 66 of Deputy Martinez's deposition.

21.   Then, most alarmingly, after Mrs. Prescott expressed needing to figure out "how" to get rid of her husband, Deputy Martinez gave Mrs. Prescott instructions on how to set up and attempt to frame Mr. Prescott for a crime. He told her, **"Separate yourself from him. Create distance and promote silence. It will provoke him and make sure to record**." Exhibit 11, pp. 98-101 (emphasis added). Deputy Martinez then instructed Mrs. Prescott to "Video him if he destroys anything," and she responded, "I wish he was that dumb lol." Exhibit 11, pp. 112-113.

22.   The totality of all the allegations against Jason Prescott contained in Mrs. Prescott's texts with Deputy Martinez, supposedly made contemporaneously with the alleged incidents happening, *do not meet the elements of any crime*. **Accordingly, for that reason alone, this text message string was exculpatory evidence for Mr. Prescott and <u>was required</u> to be preserved.**

23.   The fact that a Deputy Sheriff told Mrs. Prescott how to set up Mr. Prescott and "provoke" him is exculpatory as it clearly shows Deputy Martinez did not believe Mrs.

Prescott was a victim of domestic violence, and it calls into question the entire arrest of Mr. Prescott and the motives in arresting him. As expert witness Shane Bracken (former ACSO officer) testified, as did numerous law enforcement personnel, including Defendants in this case, it would be extremely dangerous to ever advise a true domestic violence victim on how to "provoke" her abuser and a law enforcement officer would never advise an actual victim of domestic violence to do that. Exhibit 13, p. 176 of Shane Bracken's deposition; Exhibit 14, pp. 338-340 of Shane Bracken's deposition; *See Also*, Exhibit 15, Excerpt from Defendant Undersheriff Woodman's deposition, p. 126; Exhibit 16, Excerpt from Defendant Sergeant Michael Sindelar's deposition, pp. 77-79; Exhibit 17, Excerpt from Defendant Sheriff Valdez's deposition, p. 133-134; Exhibit 18, Excerpt from Commander Roxanne Lattin's deposition, pp. 31-32.

24.   Days after this exchange, Mrs. Prescott presented herself at the Archuleta County Sheriff's Office to attempt to have Mr. Prescott arrested. During the interview with law enforcement, Mrs. Prescott was texting on her phone and told Deputy Smith she was texting her "friend," although the Deputy did not look at her phone to see the texts. Exhibit 19, p. 50. Deputy Smith knew that Mrs. Prescott had been communicating with Deputy Martinez before his interview with Mrs. Prescott, and Mrs. Prescott mentioned Deputy Martinez twice during the interview; yet Deputy Smith never talked to Deputy Martinez as part of his investigation into Mrs. Prescott's allegations. Exhibit 19, p. 49, pp. 148-149.

**III.**

**The Sheriff's Office Knew These Texts Were Evidence in a Pending Criminal Case and Later, in a Civil Case, and Were Notified to Preserve Them, Yet the Defendants**

**Made No Effort to Preserve Them and Defendant Martinez  Destroyed Them**

25.   At 4:52 p.m. on December 2, 2020, Mr. Prescott's attorney emailed the letter

attached as Exhibit 8 to Sheriff Valdez (after sending one to the Pagosa Springs Police

Chief Rockensock, who called Mr. Prescott's attorney and advised that "James" was a

Deputy Sheriff and was the SRO officer for the school, not a police officer at the Pagosa

Springs Police Department).

26.   This December 2, 2020 letter emailed to Sheriff Valdez that afternoon

provided explicit notice to the Defendants as follows:

a.  That Deputy Martinez was having an inappropriate relationship with Mrs. Prescott

who was at that very time making a report to the Sheriff's Office in order to have

her husband arrested;

b.  That there was relevant and exculpatory evidence contained in text messages

between Deputy Martinez and Mrs. Prescott;

c.  That the Deputy's name was "James" and contained the specific phone number

for the text messages and the vehicle number of the Deputy;

d.  That Ms. Prescott had made prior false allegations against Mr. Prescott;

e.  That a Florida court had explicitly found that Mrs. Prescott had staged a fake

domestic violence incident against Mr. Prescott;

f.  That court found Mrs. Prescott's mental state was so compromised based upon

the staged domestic violence that her parenting time with the children was

restricted to supervised parenting time only;

g.  That "the text messages demonstrate that Ms. Prescott is clearly attempting to

seduce the Deputy, laying the groundwork for further false allegations against Mr.

Prescott";

h.  That Mrs. Prescott sent Deputy Martinez a sexually suggestive picture in those

text messages;

i.  After sending that suggestive picture of herself in those texts, Mrs. Prescott then

asked Deputy Martinez to see if there were any police reports made against her

by Mr. Prescott;

j.  That the available texts make clear that Mrs. Prescott "is premeditating further

false allegations and has enlisted the assistance of a Sheriff's Deputy";

k.  The text messages show that Deputy Martinez had become involved in Mrs.

Prescott's schemes to falsify yet another arrest of Mr. Prescott;

l.  The text messages show that Deputy Martinez is helping Mrs. Prescott "falsify

charges against Mr. Prescott";

m.  That Mrs. Prescott was overhead stating that she put the drug Adderall in Mr.

Prescott's food so that he would "test positive" for drugs; and,

n.  *Based on the inappropriate text messages, it appears that Deputy Martinez is*

*involved in "setting up false allegations against Mr. Prescott."*

27.   Additionally, the two orders from the Florida court were provided to the

Sheriff's Office with that letter. Exhibit 8.

28.   Moreover, as stated above, when Detective Patrick Smith (then Deputy

Smith) interviewed Mrs. Prescott on December 2, 2020, Mrs. Prescott talking about Deputy

Martinez twice, and Detective Smith knew that "James" was "Deputy Martinez," so he and

the department independently knew on December 2nd exactly who the deputy was who had been in contact with Erika Prescott over this two-month period of time. Exhibit 19.

29.   On December 3, 2020, at 9:27 a.m. Sheriff Valdez responded to that December 2nd email that Mr. Prescott's attorney sent to him the prior afternoon, which email contained the court order with the finding that Erika Prescott staged a DV to attempt to frame Mr. Prescott and the order granting Jason Prescott sole custody of the children with Erika Prescott having supervised parenting time only, and which also stated specifically that Mrs. Prescott was working with James Martinez to get Mr. Prescott arrested. Exhibit 20. ***At that time, at 9:27 a.m. on December 3, 2020, the Defendants had unequivocal actual notice that the Deputy Martinez text messages with Erika Prescott contained evidence in the Jason Prescott case, a suspect they were aggressively pursuing, even violating his Constitutional rights to "ping" his cell phone without a warrant or any basis for "exigent circumstances" justifying same and*** *the Defendants had actual notice that Mr. Prescott had Court ordered full custody of the Prescott children.* See *United States v. Melton*, No. CR 21-1721 KG, 2022 WL 1404718, at *2–8 (D.N.M. May 4, 2022).

30.   Shortly thereafter, at 10:27 a.m. on December 3, 2020, Mr. Prescott's attorney sent another correspondence to Defendant Sheriff Valdez reiterating that the Florida court orders granted sole custody to Mr. Prescott and reattaching the Court Orders because Mrs. Prescott was attempting to file "kidnapping" charges against Mr. Prescott. Exhibit 21.

31.   The Defendants were undeniably then *again* on notice of the important and

exculpatory nature of these text messages which were right there in their Deputy's possession, and less than one day later, on December 4, 2020, they had Jason Prescott, criminal defendant, sitting in jail, so under any circumstance, the Archuleta Sheriff's Office had a duty to preserve this evidence for purposes of the criminal case, at a minimum.

32. Mr. Prescott was arrested in the middle of the night of December 3rd/4th, 2020, while his daughter sat by crying hysterically. In fact, the Sheriff's Office had put into place an Amber Alert, claiming with no factual basis that Mr. Prescott's children were missing and endangered, and claiming with no factual basis that Mr. Prescott had a gun and "known mental health" issues and "known substance abuse" issues. Exhibits 1 and 2, highlighted portions. Most egregiously, the Sheriff's Office had put in CCIC that Mr. Prescott had "kidnapped" the children, *after the Sheriff's Office knew Mr. Prescott was the Court ordered custodial parent*. Exhibit 1, p. 4, p. 6. When the Amber Alert was initially denied by CBI, undeterred in their the zeal to arrest Jason Prescott in the most violent manner possible, the Sheriff's Deputies called the National Center of Exploited and Missing Children to obtain an Amber Alert despite CBI's refusal. Exhibit 22; Exhibit 1, p. 7.

33. Then, while Mr. Prescott was sitting in jail on false charges, on December 4, 2020, at 3:03 p.m., **Mr. Prescott's attorney sent a specific demand for preservation of evidence to Defendant Sheriff Valdez requiring preservation of all evidence related to these text messages**:

> Sheriff, please consider this my request for you to preserve all electronic and other evidence related to any communications between any Deputy in the Department, including the Deputy by the name of "James" with cell phone number *970-398-1754* and Erika Prescott, including any and all texts, electronic communications, emails, call logs and call records and any other documentation of any and all communications between anyone in the

department, including but not limited to "James," and Erika Prescott. Such evidence will be the subject of a forthcoming subpoena and is relevant to Jason Prescott's defense in the criminal charges which have been filed against him.

Exhibit 23.

34.   On December 8, 2020, at 2:01 p.m., Mr. Prescott's criminal defense attorney sent a letter to the Deputy District Attorney specifically requesting the text messages and specifically stating that they contained exculpatory information. Exhibit 24. That message was forwarded by the Deputy D.A. to the upper echelon of the ACSO, including the Sargent Michael Sindelar and Commander Roxanne Lattin. *Id*.

35.   On December 10, 2020, at 1:00 p.m., DA Investigator George Daniels talked to James Martinez. Exhibit 9. Deputy Martinez was resistant to even give his phone number because it is his "personal" phone, but upon pressing from Mr. Daniels, Deputy Martinez confirms his telephone number as the number given to the Defendants by the Prescott attorneys on December 2, 2020, December 4, 2020 and December 8, 2020. Exhibit 10. Mr. Daniels specifically told Deputy Martinez that he needed the Erika Prescott texts. Exhibit 9; Exhibit 10. Deputy Martinez clearly hesitates and then tells Mr. Daniels he will "go through" his phone and "see" if he has them, despite it only being a week earlier and he should clearly remember, particularly since he had been communicating regularly with Mrs. Prescott for nearly three months. Exhibit 10. Deputy Martinez hesitates and is clearly seeing those texts on his phone and claims he will let the investigator know if he has "screenshots." *Id*. Deputy Martinez downplays his relationship with Mrs. Prescott and claims they only communicated regarding the dogs, clearly not true. *Id.* Deputy Martinez told the DA investigator that he told Mrs. Prescott to call the police if she needed help, but

that is not in the existing texts, proving there were additional texts that Deputy Martinez sought to hide. Deputy Martinez claims to not know Mr. Prescott's name, but Mrs. Prescott clearly asks Deputy Martinez if her husband has filed a police complaint against her and Deputy Martinez says there has been nothing, so clearly he knew Mr. Prescott's name in order to know he had not filed anything.

36.   Minutes after the audio recording in Exhibit 10, Deputy Martinez texts investigator George Daniels and tells him he did not have any of the text messages. Exhibit 9, p. 2.

37.   After the criminal charges were rightfully dismissed against Mr. Prescott on January 6, 2021, the next day, on January 7, 2021, Mr. Prescott's attorney sent the Sheriff's Department the "Demand for Evidence Preservation" attached hereto at Exhibit 25.

38.   Even Alex Lowe, the Deputy District Attorney, told Sheriff Valdez on January 8, 2021, to preserve the evidence, even after the charges were dismissed against Mr. Prescott. Exhibit 26.

39.   **At all times from December 2, 2020 until the present day, the Defendants were clearly aware of their unequivocal duty to secure and preserve those text messages.**

40.   Despite this, between the December 10, 2020 discussion with the DA Investigator and his discussion with Commander Roxanne Lattin on December 15, 2020, Deputy Martinez claims that he changed his number and deleted the text messages forever. Exhibit 9; Exhibit 27. Deputy Martinez told Commander Lattin, on December 15,

2020, that he "had previously changed his personal cell phone number and no longer had any records of the texts between Erika and him on his phone." Exhibit 27, p. 3.

41.    However, five days earlier, Deputy Martinez confirmed his phone number with the DA Investigator and told him that was his phone number and he would check and "see" if he had the texts. Just five days later, and after multiple requests for the text messages, including requests from the DA's office, he then claimed he had deleted the texts or otherwise destroyed them by allegedly changing his phone number, all while knowing that the texts were evidence in a pending criminal case. Ironically, Deputy Martinez, in his effort to avoid the inappropriate relationship he was having with Erika Prescott, admitted in his deposition that he felt the text messages were evidence of Mrs. Prescott being a victim of domestic violence, yet Deputy Martinez deleted those evidentiary text messages. Exhibit 28, p. 82 of Deputy Martinez's deposition.

42.    It is clear that Deputy Martinez had to completely change his number so there would be no record whatsoever of those texts he sought to hide from Mr. Prescott by destroying them.

43.    The Sheriff and Undersheriff did nothing to secure these text messages despite knowing their importance and exculpatory nature and the intentional deletion of those messages to hide them from Jason Prescott is unconscionable and sanctionable. Nothing short of a default judgment on liability in this case will make Mr. Prescott whole, as detailed below.

44.    None of the Defendants or anyone at the Sheriff's Office did anything to preserve or obtain the text messages. Exhibit 29, pp. 15-19 of Deputy Martinez's

deposition. In fact, Deputy Martinez was never reprimanded or admonished in any way for deleting this critical evidence. Exhibit 30.

45.   It was roundly admitted by the Defendants that the text messages that do exist were exculpatory and concerning, and that it was inappropriate for Deputy Martinez to delete them. Exhibit 31, highlighted portions.

46.   Deputy Martinez and others in the Sheriff's Office have admitted that (1) the texts were destroyed *after four notices* that they were evidence in a pending criminal case, with three specific requests to preserve the evidence, *one of which was by the DA Investigator who asked Deputy Martinez for the texts and told him they must be turned over to Mr. Prescott and his attorneys*; (2) the Defendants did nothing to preserve the texts despite being on notice that they were exculpatory evidence in a criminal case and despite being put on notice to preserve the texts in any event, to the great prejudice of the Plaintiffs.

## IV

## The Intentionally Destroyed Text Messages Are Critical to Proving Why the Sheriff's Office Took the Extreme and Extraordinary Measures it Took to Effect the Unlawful Arrest Jason Prescott in the Most Dangerous Manner Possible

47.   There is no question that there were ongoing texts after November 29, 2020, and that they were material and exculpatory for Mr. Prescott in his criminal case. They would also have fleshed out the details for Mr. Prescott's civil rights and outrageous conduct claims in this civil case. The Defendants' intentional actions in destroying and permitting destruction of those texts deserve the severest of sanctions this court can

impose.

48.    The intentional destruction of this critical evidence has kneecapped Mr.
Prescott's ability to prove this critical part of his case to the jury, and the only remedy for
this egregious behavior by the law enforcement defendants is a default judgment on
liability.

49.    Deputy Martinez's intentional acts, with the clear complicity of the other
Defendants who knew at all times that those texts were evidence in a criminal case,
destroyed forever this extremely critical evidence, which would have proven the conspiracy
of the Defendants in their false arrest of Mr. Prescott, would have proven the motive for
their outrageous conduct and their malicious prosecution of Jason Prescott, for Deputy
Martinez's personal interests in Mr. Prescott's wife.

50.    The ACSO pursued Mr. Prescott with an inordinate zeal, particularly for "cold"
DV claims of non-physical misdemeanors. When Deputy Smith interviewed Mrs. Prescott,
the Deputy had no intention of pursuing charges against Mr. Prescott as Mrs. Prescott had
not alleged anything that would rise to probable cause, but then Deputy Smith was
inexplicably instructed to swear out a warrant and pursue Mr. Prescott's arrest by his
supervisor, Deputy Martinez's longtime childhood friend, Roxanne Lattin. Exhibit 32, p. 2,
4, 6; Exhibit 33, highlighted portions. The Sheriff's Office, *before obtaining the warrant at
9:38 p.m.*, through one of Deputy Smith's superiors sent three armed officers to Mr.
Prescott's home. *Three officers*, for a cold D.V. case with no physical contact even alleged.
What is more is that Deputy Smith, the investigating officer who was preparing the warrant,
had no idea these three deputies went to Mr. Prescott's home and had no idea why they

would have done that. This means they did not confer with Deputy Smith or have any direction from the investigating officer, presumably because they went there to arrest Mr. Prescott at gunpoint. Deputy Smith left out of his affidavit for the warrant that Mrs. Prescott flatly told him that she had intentionally and specifically left the children with Mr. Prescott because she was dealing with her own head and could not deal with the children, yet Mr. Prescott was accused of "kidnapping" the children. Mrs. Prescott said she had restricted parenting time. Mrs. Prescott specifically stated that Mr. Prescott had never hit her and that he was not a danger to the children. Yet Deputy Smith was instructed, and Undersheriff Woodman was "adamant," that Deputy Smith ping Mr. Prescott's phone without a warrant and with no effort to obtain one. Indeed, upon learning that there could be no exigency because it was Mr. Prescott with full legal custody of the children, Mr. Prescott's rights were violated again. Most egregiously, information was put into CCIS that Mr. Prescott was armed and dangerous and a known substance abuser, *with zero proof of same*, and that the children were missing and endangered because Mr. Prescott had kidnapped them. This information was repeated over and over in the notes which are broadcast to all law enforcement officers, even after the ACSO *knew for a fact* that it was Mr. Prescott who had full legal custody of the children. Then, when CBI denied the Amber alert because Mr. Prescott's parental rights were intact, Deputy Smith was told by Undersheriff Woodman to contact the Center for Missing and Exploited Children to attempt to obtain the Amber Alert. And this was all after Deputy Smith had already told dispatch to stop pinging Mr. Prescott's phone because they were going to take a more "subtle" approach since Mr. Prescott's attorney's were in contact with them, only to be overridden by the Undersheriff who insisted

that Deputy Smith continue to illegally and unconstitutionally ping Mr. Prescott's phone. All
of the foregoing statements of fact in this paragraph are confirmed in the highlighted
portions of the attached Exhibits 1, 32, and 33.

51.    The only explanation for this over-the-top outrageous conduct by the ACSO
and the flagrant violation of Mr. Prescott's constitutional rights is that the ACSO was going
to take care of their own, Deputy Martinez, and make sure his girlfriend's husband was in
jail and out of the picture.

52.    Thus, those missing text messages were crucial to Mr. Prescott's case.

## V

## Default Judgment on Liability is the Only Sanction to Cure This Intentional

## Destruction of Evidence

53.    Federal Rule of Civil Procedure Rule 37(e) provides the following:

(e) FAILURE TO PRESERVE ELECTRONICALLY STORED INFORMATION. If
electronically stored information that should have been preserved in the
anticipation or conduct of litigation is lost because a party failed to take
reasonable steps to preserve it, and it cannot be restored or replaced through
additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may
order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another
party of the information's use in the litigation may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was
unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

54.    Here, there is no question that the Defendants willfully destroyed the
evidence specifically because it would be the final evidence Mr. Prescott needed to prove

his case. In listening to the DA investigator's interview of Deputy Martinez, there can be no question but that Deputy Martinez realized that he had lied about the content of the texts and was going to make sure he did not ever have to give them over, by going so far as to *change his phone number* after specifically being told those texts had to be turned over, even over his protestations.

55.   A party has a duty to preserve evidence when the party knows the evidence is relevant or when they know or should know the evidence would be relevant to litigation. "A litigant has a duty to preserve evidence that he knows or should know is relevant to imminent or ongoing litigation." *Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv., Inc.*, 139 F.3d 912 (10th Cir. 1998).

> This court respectfully rejects the notion that a party's obligation to preserve information arises only after it understands the *precise* nature of the *specific* litigation at issue. Courts in this District have found that putative litigants had a duty to preserve documents once a party has notice[6] that the evidence is relevant to litigation or when a party knew or should have known that the evidence may be relevant to future  litigation. *Cache La Poudre Feeds*, 244 F.R.D. at 620; *Asher Associates, LLC. v. Baker Hughes Oilfield Operations, Inc.*, No. 07–cv–01379–WYD–CBS, 2009 WL 1328483 (D.Colo. May 12, 2009)) (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y.2003)). The most recent amendments to Rule 37(e) of the Federal Rules of Civil Procedure are consistent with this notion, in the context of preserving electronically stored information:

>> In applying the rule, a court may need to decide whether and when a duty to preserve arose. Courts should consider the extent to which a party was on notice that litigation was likely and that the information would be relevant.

>> Advisory Committee Notes to Fed. R. Civ. P. 37(e) (eff. Dec. 1, 2015).

*Zbylski v. Douglas Cnty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1162–63 (D. Colo. 2015). In this

case, the extent to which the Defendants were on notice that the information would be

relevant is enormous. They were told so and that it must be preserved over and over, in no

uncertain terms, formally and informally, and including by the District Attorney's Office.

  56. This duty to preserve is triggered whether the litigation is criminal or civil. *Id.*,

154 F. Supp. 3d at 1164.

> "In determining whether a party's duty to preserve has been triggered, courts
> evaluate facts such as the likelihood that a certain kind of incident will result
> in litigation; the knowledge of certain employees about threatened litigation
> based on their participation in the dispute; or notification received from a
> potential adversary." *Zbylski*, 154 F. Supp. 3d at 1163. Additionally, "[c]ourts
> have found the duty to preserve to be triggered based on an internal
> investigation into an incident." *Id.* Ultimately, "a party's duty to preserve arises
> when it has notice that the [evidence] might be relevant to a reasonably-
> defined future litigation." *Id.*

*Marshall v. Target Corp.*, No. 17-CV-00880-WYD-STV, 2018 WL 3475204, at *3 (D. Colo.

July 19, 2018).

> Thus, the initial inquiry is whether "the non-producing party had a duty to
> preserve the evidence in question." *Id.* The person asserting the presumption
> must show that "the party who destroyed the evidence had notice both of the
> potential claim and of the evidence's potential relevance." *Id.* (*quoting* 1
> WEINSTEIN & BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 301.06 at
> 301–28.3 (2d ed.2003)). Notice of a claim "does not refer to any particular
> statistical probability that litigation will occur; rather, it simply means that
> litigation is more than merely an abstract possibility or unwarranted fear. The
> underlying inquiry is whether it was reasonable for the investigating party to
> anticipate litigation and prepare accordingly." *National Tank Co. v.
> Brotherton,* 851 S.W.2d 193, 204 (Tex.1993) (Necht, J., dissenting)
> (discussing notice of a claim in a difficult context).

*Rowe v. Albertsons, Inc.*, 116 F. App'x 171, 174 (10th Cir. 2004).

Weighing these factors, the Court concludes that Target had a duty to preserve the videos showing the entryway. It appears that the videos were overwritten on May 26, 2015, thirty days after the incident. [*See* #35-2 at 78:19-22, 82:7-13; #35-1 at 36:24-25, 37:1-7; #35-7] As of that date, Target knew that Plaintiff had fallen in one of their stores and had broken her humerus in the fall, including due to Plaintiff's guest incident report filed on April 30, 2015 [#31-2], Ms. Prince's efforts to find video of the incident [#35-1 at 21:9-12], Target's notification to Sedgwick Company on May 1 of Plaintiff's fall [#31-3 at 4; #31 at 5], Plaintiff's reports of the incident to a Sedgwick Company representative, and Mr. Hammer's opening of a claim and communications with Ms. Prince and Plaintiff [#31-3 at 6-14]. This is the type of incident that a company could expect to lead to litigation. Moreover, Target knew that Plaintiff had claimed that she had fallen on a wet spot on the floor of its store, that she held Target at least partially responsible for her injuries, and that Plaintiff intended to file a "claim" for her medical expenses. [*See* #31-3 at 14 (Plaintiff indicating to Mr. Hammer that she believed Target to be "a little responsible" and that she would be filing a claim against Target for medical expenses); *see also id.* at 6 (Plaintiff's statement to a Sedgwick Company representative that she was "making a claim"). Such details were sufficient to put Target on notice that there would be "a reasonably-defined future litigation." *Zbylski*, 154 F. Supp. 3d at 1163; *see also Browder*, 187 F. Supp. 3d at 1296 (duty to preserve triggered where plaintiffs' attorney sent a letter to defendant stating that plaintiffs "intend[ed] to pursue a claim in regards to the incident at issue")

Such details were also sufficient to place Target on notice that the video showing the entryway may be relevant to that reasonably-defined litigation. In particular, the video may have shown whether a wet floor or other warning sign had been placed at the entryway. Indeed, in his June 4, 2015 email, Mr. Hammer acknowledged that the entryway video would "be helpful to see what the front of the store looks like and how the area was set up for a rainy day." [#31-3 at 3] Thus, the Court concludes that Target was on notice prior to the entryway video's destruction that the entryway video might be relevant to a reasonably-defined future litigation. Accordingly, the Court concludes that Target had a duty to preserve the entryway video.

Similarly, Target was on notice that the videos showing Plaintiff shopping were relevant to the litigation. Target disputes that Plaintiff fell, let alone that

> she broke her humerus during the fall. [*See* #31-6 at 29:22-24; *see also* #35
> at 1-3] The videos of her shopping would have shown Plaintiff's arm and
> whether she was holding it, or favoring one arm over the other. Such
> evidence is relevant to whether Plaintiff fell and, if so, the severity of her
> injuries. Accordingly, the Court concludes that Target had a duty to preserve
> any videos of Plaintiff shopping on the date of the incident.

*Marshall v. Target Corp.*, No. 17-CV-00880-WYD-STV, 2018 WL 3475204, at *3–4 (D.

Colo. July 19, 2018).

57.    Here, there is no question but that the text messages were not only relevant

evidence in a then-pending criminal case, for a Defendant sitting in custody in Colorado

Springs, but even after that case was dismissed, the very next day the Sheriff's Office was

on notice that the texts were evidence in the upcoming civil case. There is no question the

Defendants knew of their duty to preserve this evidence, and they were given information

detailing those texts' relevance. Moreover, the Sheriff's Office had a right to these text

messages which were relevant to, and exculpatory for, a criminal defendant and obtaining

those text messages from Deputy Martinez was not only their duty but their right:

> The Fourth Amendment guarantees "[t]he right of the people to be secure in
> their persons, ... and effects, against unreasonable searches and seizures."
> U.S. Const. amend. IV. This protects people against arbitrary and invasive
> acts by government actors, including when the government is acting as an
> employer. City of Ontario, Cal. v. Quon, 560 U.S. 746, 755–56, 130 S.Ct.
> 2619, 177 L.Ed.2d 216 (2010). **The Supreme Court has recognized,**
> **however, that government employers have special needs that "make**
> **the warrant and probable-cause requirement impracticable."** Id. at 756,
> 130 S.Ct. 2619 (citing O'Connor v. Ortega, 480 U.S. 709, 725, 107 S.Ct.
> 1492, 94 L.Ed.2d 714 (1987) (plurality opinion); 480 U.S. at 732, 107 S.Ct.
> 1492 (Scalia, J., concurring in part)). **The O'Connor plurality proposed a**
> **two-step analysis to analyzing Fourth Amendment claims against**
> **government employers: first, did the employee have a reasonable**
> **expectation of privacy given the operational realities of the workplace,**

> **O'Connor, 480 U.S. at 717, 107 S.Ct. 1492, and second, if the intrusion was for noninvestigatory, work-related purposes or for work-related misconduct, was it reasonable under the circumstances, id. at 725–26, 107 S.Ct. 1492.**

*Barrett v. Town of Plainville*, 272 F. Supp. 3d 235, 239 (D. Mass. 2017) (emphasis added).

58.    Those text messages could be obtained by the Sheriff, Undersheriff and Sergeant, not only because they were for work-related purposes, that is, they were necessary to disclose for a pending criminal case, but also because Deputy Martinez's text messages with Erika Prescott constituted misconduct under the Sheriff's Office own policies and procedures. Exhibit 34, highlighted portions. Moreover, the policies clearly provide that any text messages or other evidence on a personal device will be transferred to an ACSO device as soon as practicable, so they had a right to collect that evidence. *Id.*, at p. 5. The failure to do so was simply intentional; all evidence demonstrates the degree to which the Defendants sought to thwart and endanger Mr. Prescott. As such, default is the appropriate sanction:

> Where spoliation is intentional or committed in bad faith, **the court may enter default judgment in favor of (and dismiss claims against) the innocent party**. *See Phillip M. Adams,* 621 F.Supp.2d at 1192; *Computer Assocs. Int'l, Inc.,* 133 F.R.D. at 169–70. The facts of this case and case law supports such a sanction in this case.

*Philips Elecs. N. Am. Corp. v. BC Tech.*, 773 F. Supp. 2d 1149, 1213 (D. Utah 2011) (emphasis added).

> Spoliation that sabotages a strong case supports default judgment; spoliation that destroys collateral evidence in a weak case does not require the same penalty.

*Boneck v. City of New Berlin*, 22 F. App'x 629, 630 (7th Cir. 2001). As is clearly shown above, Mr. Prescott has an extremely strong case with clear documentation. This destroyed evidence is not collateral to a weak case, but central to a strong case. The Defendants cannot benefit from their violation of the law and their own policies, which will encourage them to proceed exactly as they did in this case despite their duty as law enforcement officers and as a result of preservation letters to obtain and preserve this evidence.

> Cases across the country confirm that the duty to preserve means action must be taken to preserve evidence, meaning that it is not lost, destroyed, inadvertently or negligently overwritten, or intentionally wiped out, and that it is available to be produced to the other side.

*Philips Elecs. N. Am. Corp. v. BC Tech.*, 773 F. Supp. 2d 1149, 1195 (D. Utah 2011). This was not mere negligence or accident; this was a clear, intentional bad faith effort to deny Jason Prescott this crucial evidence which, frankly, the Sheriff's Office knew from December 2, 2020, would sink them.

59.    The Defendants' intentional destruction of this evidence they knew they were required to obtain and retain, both for purposes of the criminal case and for purposes of the civil case, demands the highest, most severe sanction of default judgment. *See Seeley v. Board of County Com'rs*, 791 P.2d 696, 700 (Colo. 1990) (Sheriff responsible for acts of deputies). "Thus, agency law is directly applicable to a spoliation motion, and the level of culpability of the agent can be imputed to the master. *See, e.g., Nucor Corp. v. Bell,* 251 F.R.D. 191, 198–99 (D.S.C.2008) (agent's willful 'alteration or destruction of relevant data' on laptop was directly attributable to defendant); *Connor v. Sun Trust Bank,* 546 F.Supp.2d 1360 (N.D.Ga.2008) (agent's bad faith destruction of email was

attributable to defendant).")." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497,

516 (D. Md. 2010), <u>aff'd in part, modified in part,</u> No. CV MJG-06-2662, 2010 WL

11747756 (D. Md. Nov. 1, 2010), FN #23.

> A party may be held responsible for the spoliation of relevant evidence done
> by its agents. *See New Jersey Mfrs. Ins. Co. v. Hearth & Home Techs., Inc.,*
> No. 3:06–CV–2234, 2008 WL 2571227, at *7 (M.D.Pa. June 25, 2008) ("A
> party to a law suit, and its agents, have an affirmative responsibility to
> preserve relevant evidence. A [party] ... is not relieved of this responsibility
> merely because the [party] did not itself act in bad faith and a third party to
> whom [the party] entrusted the evidence was the one who discarded or lost
> it.") (citations omitted). Thus, agency law is directly applicable to a spoliation
> motion, and the level of culpability of the agent can be imputed to the master.
> *See, e.g., Nucor Corp. v. Bell,* 251 F.R.D. 191, 198–99 (D.S.C.2008) (agent's
> willful "alteration or destruction of relevant data" on laptop was directly
> attributable to defendant); *Connor v. Sun Trust Bank,* 546 F.Supp.2d 1360
> (N.D.Ga.2008) (agent's bad faith destruction of email was attributable to
> defendant).

*Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 523 (D. Md. 2009), FN #16. This is

particularly true under circumstances such as these where the Defendant Sheriff,

Undersheriff and Sergeant took no step whatsoever to preserve the evidence. Exhibit 35.

*See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 506–07

(E.D. Va. 2011). In fact, not only did the Sheriff, Undersheriff and Sergeant do nothing to

preserve this crucial evidence, Deputy Martinez was not punished or admonished in any

way for deleting this evidence in a criminal case.

        60.   This was simply a concerted effort to stonewall Mr. Prescott. Defendants

continue to refuse to respond to discovery, including the most basic discovery to which

Plaintiffs are entitled, such as bodycam of three officers going to Mr. Prescott's home on

the night the ASCO fraudulently obtained a warrant for Mr. Prescott's arrest, as well as

notes and correspondence known to exist. And the correspondence that has been

provided by the Defendants demonstrates their clear efforts to *avoid* retaining this critical

evidence which they were not only required to retain for purposes of the criminal case, but

were required to retain due to three separate preservation notices they received, including

contacting the Deputy District Attorney and the County Attorney rather than simply

obtaining and retaining the evidence.  The Sheriff discussed the evidence but intentionally

did not preserve it. Exhibit 36.

61.   Law enforcement officers have a duty to preserve evidence in a criminal

case, and these law enforcement officers' failure to do so warrants the most severe

sanction of default:

> The Court previously determined that the City had a duty, under Montana
> law, to preserve the video recording of Peschel's arrest. The duty arose, in
> the first instance, from the obligation imposed upon officers of the Missoula
> Police Department to preserve the video recording, during the entirety of the
> criminal proceedings, and disclose that video recording to Peschel. Dkt. # 72,
> at 32–34; *State v. Swanson,* 222 Mont. 357, 722 P.2d 1155, 1158 (1986)
> ("the police ha[ve] a duty to see to [the] safekeeping [of potentially
> exculpatory evidence]"). The duty remained through the ultimate disposition
> of the criminal charge and continued after the completion of the criminal
> proceedings which ended in an acquittal of Peschel. At that point it was
> reasonably foreseeable that civil litigation would ensue which obligated the
> City, as a potential defendant in a future civil action, to preserve the
> evidence. Dkt. # 72, at 35–36. The existence of the duty to preserve the
> video recording of the arrest provides the basis upon which this Court may
> exercise its discretionary inherent authority to impose evidentiary sanctions
> for the pre-litigation breach of a duty to preserve the evidence. *Id.; In re
> Napster, Inc. Copyright Litigation,* 462 F.Supp.2d 1060, 1077–78
> (N.D.Cal.2006).

The principle dispute in this case is whether or not the on-the-scene officers
used unreasonable force, under the existing circumstances, to arrest
Peschel. The video recording which captured the entire sequence of events
surrounding the arrest constituted not only relevant evidence, but the best
evidence of the circumstances existing at the time of Peschel's arrest, as well
as the type and amount of force used to effect his arrest. *See Blanford v.
Sacramento County,* 406 F.3d 1110, 1115 (9th Cir.2005) ("[the] balancing
test [employed in determining the reasonableness of a seizure] entails
consideration of the totality of the facts and circumstances in the particular
case, including 'the severity of the crime at issue, whether the suspect poses
an immediate threat to the safety of the officers or others, and whether he is
actively resisting arrest ...' ") (quoting *Graham v. Connor,* 490 U.S. 386, 396,
109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). *See also Smith v. City of Hemet,*
394 F.3d 689, 701 (9th Cir.2005) (the reasonableness of a seizure must be
assessed by carefully considering the "objective facts and circumstances that
confronted the arresting officers").[3]

The City contends that a sanction of any kind is not warranted, let alone a
default judgment. As to the issue of whether the officers used reasonable
force, the City argues that a sanction is not necessary to restore the Plaintiff
to the position he would have held had the video not been lost. According to
the City, Peschel is not prejudiced because eye witnesses to the arrest can
testify as to what happened at the scene. The Court disagrees.

*Peschel v. City Of Missoula*, 664 F. Supp. 2d 1137, 1143–44 (D. Mont. 2009). An inference

by the jury is simply not enough when law enforcement is involved, and there must be a

deterrent effect to the sanction:

The rebuttable presumption created by the adverse jury inference instruction
would not sufficiently punish the City for its spoliation nor serve as a sufficient
disincentive to destroy evidence. Absent a stricter sanction, the City would
proceed to trial pitting the evidence of its officers against the Peschels and
the other percipient witnesses—unphased by its spoliation of the video
recording. Likewise, the rebuttable presumption would be insufficient to cure
the prejudice to Peschel resulting from the loss of the best evidence of what
occurred during his arrest. *See Unigard,* 982 F.2d at 369 (affirming district
court's exclusion of evidence on the grounds that rebuttable presumption

would have been insufficient to cure prejudice).

_Id._, 664 F. Supp. 2d at 1148.

As a direct result of Defendant SCSO's wanton and willful disregard of its obligations to preserve evidence, both as a litigant and as a law enforcement entity, SCSO has inhibited the production of evidence that may have been detrimental to its case. Whether the spoliated evidence would have actually been detrimental to the case is irrelevant at this point, because no one, other than perhaps the Defendants themselves, can know for certain. _See Telectron, Inc. v. Overhead Door Corp.,_ 116 F.R.D. 107, 133 (S.D.Fla.1987)( "[W]hile it is now impossible to determine precisely what or how many documents were destroyed, the bad faith destruction of a relevant document, by itself, 'gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction.' ") (citations omitted).

_Swofford v. Eslinger_, 671 F. Supp. 2d 1274, 1282 (M.D. Fla. 2009).

A failure to preserve evidence may be negligent, grossly negligent, or willful, but the intentional destruction of relevant records—either paper or electronic—is clearly willful conduct. _Philips Electronics N. America Corp. v. BC Technical,_ —— F.Supp.2d ——, No. 2:08–cv–639 CW–SA, 2011 WL 677462, at *48 (D.Utah Feb. 16, 2011) (citing _Pension Comm.,_ 685 F.Supp.2d at 463. After the duty to preserve attaches, the failure to collect either paper or electronic records from key players, the destruction of email, or the destruction of backup tapes is grossly negligent or willful behavior. _Id._ (citing _Pension Comm.,_ 685 F.Supp.2d at 455). Moreover, "[b]ad faith, or culpability, 'may not mean evil intent, but may simply signify responsibility and control.' " _Id._ (quoting _Phillip M. Adams & Associates, L.L. C. v. Dell, Inc.,_ 621 F.Supp.2d 1173, 1193 (D.Utah 2009)).

_McCargo v. Texas Roadhouse, Inc._, No. 09-CV-02889-WYD-KMT, 2011 WL 1638992, at *8 (D. Colo. May 2, 2011).

Disciplinary sanctions under Rule 37 are intended to serve three purposes. First, they ensure that a party will not benefit from its own failure to comply. Second, they are specific deterrents and seek to obtain compliance with the

particular order issued. Third, they are intended to serve a general deterrent effect on the case at hand and on other litigation, provided that the party against whom they are imposed was in some sense at fault.

*Update Art, Inc. v. Modiin Publ'g, Ltd.,* 843 F.2d 67, 71 (2d Cir.1988); *see also Nat'l Hockey League,* 427 U.S. at 643, 96 S.Ct. 2778 (noting that Rule 37 sanctions may serve both to "penalize those whose conduct may be deemed to warrant" them and to "deter those who might be tempted to such conduct in the absence of such a deterrent"). Even when a party finally (albeit belatedly) *complies* with discovery orders after sanctions are imposed, these purposes may still justify the sanctions:

> [I]f parties are allowed to flout their obligations, choosing to wait to make a response until a trial court has lost patience with them, the effect will be to embroil trial judges in day-to-day supervision of discovery, a result directly contrary to the overall scheme of the federal discovery rules. Moreover, … compulsion of performance in the particular case at hand is not the sole function of Rule 37 sanctions. Under the deterrence principle of [*National Hockey League* ], plaintiff's hopelessly belated compliance should not be accorded great weight. Any other conclusion would encourage dilatory tactics, and compliance with discovery orders would come only when the backs of counsel and the litigants were against the wall.

*Cine Forty–Second St. Theatre,* 602 F.2d at 1068 (internal quotation marks omitted). In light of the record before us, it is clear that the district court did not abuse its discretion in concluding that a default sanction here was appropriate to serve these purposes.

*S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 149 (2d Cir. 2010).

62.    The cases where just an adverse inference is ordered, versus default, do not involve law enforcement officers who are *required to preserve evidence anyway*, and who intentionally deleted the evidence they were told *four times* they needed to preserve and produce Moreover, those cases do not have the willful destruction of evidence, with the

entire Sheriff's Office complicit. Again, Mr. Prescott was a criminal defendant sitting in jail,
yet the Sheriff's Office did nothing to collect this clear evidence. When the DA Investigator
spoke with Deputy Martinez, those texts still existed. It was only after the DA Investigator
told Deputy Martinez they would have to be produced that he deleted them. *The Sheriff's
Office should have already obtained the text messages.* Their own policy requires that any
evidence on the Deputy's personal phone must be transferred to an ACSO device. *That is
their own policy.* They had every right to force Deputy Martinez to provide those texts, but
they simply did not want to do so. They all knew what was going on because they were
complicit. They were specifically going after Jason Prescott in the most egregious and
outrageous manner. Of course they were not going to turn over evidence that would
reveal the scheme. In fact, they were fully on notice of the general contents of those texts
as a result of the December 2, 2020 letter. They specifically knew the contents and how
damning those texts were, and that is the reason they willfully destroyed them.

63.   These are law enforcement officers. These are people whom the public must
be able to trust. Instead, they intentionally destroyed evidence in a criminal case, and
intentionally destroyed evidence they were specifically on notice to preserve. Public policy
requires that the most severe of sanctions be the result of this lawless behavior by law
enforcement officials. They knew of their duty and intentionally disregarded it because
they believe they are above the law. This is the exact reason a default sanction is the only
appropriate sanction for these Defendants. At the very least, the Court must instruct the
jury that it must assume that the texts were damning and reflected a conspiracy.

> In other words, courts have recognized that if parties are willing to take the
> risk and balance destroying evidence against turning over the proverbial

smoking gun, knowing that the destruction will not result in the ultimate judgment, destruction of important evidence will occur. The court must not inherently reward the misbehavior of companies and individuals who want to destroy incriminating evidence rather than produce it and have a judgment entered against them; litigants must be strongly discouraged, rather than encouraged in any way, to become more and more clever about how to delete and hide the destruction of electronic documents.

*Philips Elecs. N. Am. Corp. v. BC Tech.*, 773 F. Supp. 2d 1149, 1213 (D. Utah 2011).

"Sanctions for spoliation may also be designed to promote accurate fact finding by the court or jury." *Koch Ind.,* 197 F.R.D. at 490. "When deciding whether to sanction a party for the spoliation of evidence, courts have considered a variety of factors, two of which generally carry the most weight: (1) the degree of culpability of the party who lost or destroyed the evidence; and (2) the degree of actual prejudice to the other party." *Patten v. Target Corp.,* 2009 WL 1279331, *3 (D.Colo.2009) (unpublished opinion) (internal quotations & citations omitted).

*U.S. ex rel. Baker v. Cmty. Health Sys., Inc.*, No. CIV. 05-279 WJ/ACT, 2012 WL 12294413, at *3 (D.N.M. Aug. 31, 2012), objections overruled, No. CIV. 05-279 WJ/ACT, 2012 WL 5387069 (D.N.M. Oct. 3, 2012).

As stated, I have found that AF intentionally destroyed evidence after the obligation to preserve it arose and after AF had clear notice of that obligation. Therefore, I find and conclude that AF acted willfully….
I find and conclude that no alternative sanction short of a default judgment would adequately punish AF and deter future like-minded litigants. Any lesser sanction would allow a party possessing evidence that would insure an adverse result to destroy that evidence with impunity, thus assuring defeat for the opponent while risking only a comparatively mild rebuke… It follows that the only sanction adequate and appropriate to punish AF and deter future similarly situated litigants is default judgment on liability.

*Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*, 133 F.R.D. 166, 170 (D. Colo. 1990).

64. Here, the degree of culpability is monumental, as is the prejudice to the

Plaintiffs. Those texts would prove that the outrageous actions of the ACSO were all designed to arrest Jason Prescott at any cost because that is exactly what Deputy Martinez promised Erika Prescott, who Deputy Martinez was trying to move into his home. The impetus to accomplish this in the most violent manner possible was clearly evidenced when the investigating officer Patrick Smith  gave Mrs. Prescott the civil remedies available to her and had no intention of seeking a warrant for Mr. Prescott's arrest, that is, until he was instructed to seek a warrant, claim the children were kidnapped and omit all of the relevant information from that warrant, while simultaneously pinging Mr. Prescott's phone without a warrant, in violation of his constitutional rights.

65.   Only the most severe of sanctions will stop these law enforcement Defendants from choosing to destroy evidence they know will harm them instead of turning it over, proceeding as if they themselves are above the law.

> In considering the facts of this case, the court concludes that sanctions less than those requested by Philips—including default judgment—would not effectively either deter others from such behavior in other cases or make Philips whole from the permanent destruction of so many documents. As a result, the court recommends that BCT's amended answer be stricken, that BCT's counterclaims be dismissed, and that judgment by default be entered in Philips' favor. The court also has concluded that monetary sanctions are appropriate in this case, and will file a separate order addressing those sanctions.

*Philips Elecs. N. Am. Corp. v. BC Tech.*, 773 F. Supp. 2d 1149, 1216 (D. Utah 2011). This Court must act to deter this type of egregious behavior from law enforcement officers and impose a default judgment on liability against these Defendants.

Dated this 18th day of June 2025.

*/s/ Donald Lawrence, Jr.*
Donald Lawrence, Jr.
The Law Firm of Lisa Ward, LLC
101 W. 11th Street, Ste. 101
Durango, CO 81301
970-259-1120
Email: dlawrence@wardlawdurango.com
Attorney for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on this 18th day of June 2025 through the US District Court e-service system to the following:

Sean J. Lane, Esq.
Brittney Townsley, Esq.
**THE LANE LAW FIRM, P.C.**
3131 S Vaughn Way, Suite 220
Aurora, Colorado 80014

*/s/ Donald Lawrence, Jr.*
Donald Lawrence, Jr.