**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv-03252-CNS-SBP

JASON AARON PRESCOTT, individually and as next friend of J.R.P., and J.E.P., minors,

      Plaintiffs,

v.

RICHARD VALDEZ, individually and in his official capacity as Sheriff of Archuleta County, Colorado;
JAMES MARTINEZ, individually and in his official capacity as Deputy Sheriff of Archuleta County, Colorado;
DEREK WOODMAN, individually and in his official capacity as Undersheriff of Archuleta County, Colorado;
WARREN BROWN, in his official capacity as Operations Commander in the Archuleta County Sheriff's Office;
MICHAEL SINDELAR, individually and in his official capacity as a Deputy Sheriff in the Archuleta County Sheriff's Office;
JOHN DOES 1-5, whose actual names are unknown as yet to the Plaintiff; and
JANE DOES 1-5, whose actual names are unknown as yet to the Plaintiff,

      Defendants.

---

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

**Susan Prose, United States Magistrate Judge**

Plaintiff Jason Aaron Prescott, individually and as next friend of his minor children, brings this action pursuant to 42 U.S.C. § 1983 stemming from his December 4, 2020 arrest on allegations of domestic violence. This matter is before the Court on Plaintiffs' Motion for Sanctions for Spoliation of Evidence (ECF No. 201) (the "Motion"). The Motion was referred to this Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1). *See* ECF Nos. 99, 100. The court held a

full-day evidentiary hearing on November 5, 2025, receiving testimony from George Daniels, James Martinez, Richard Valdez, Derek Woodman, Michael Sindelar, Roxanne Lattin, and Jason Prescott. *See* ECF No. 262 (minute entry); ECF No. 267 (transcript of evidentiary hearing).

The court has carefully reviewed the Motion, Defendants' Response (ECF No. 234), Plaintiffs' Reply (ECF No. 239), the hearing transcript (ECF No. 267), documents that are part of the court record and other exhibits admitted in the course of the hearing, Defendants' status reports and the forensic examiner's conclusions regarding recovery efforts for the text messages that are the subject of this Motion (ECF Nos. 266, 280, 281), the parties' Joint Status Report (ECF No. 286), and the applicable law. The undersigned now respectfully **RECOMMENDS**[1] that the Motion be **GRANTED in part**, to the extent the court finds that an adverse-inference spoliation sanction is warranted here, and **DENIED in part**, insofar as Mr. Prescott seeks a spoliation sanction in the form of a default judgment on liability against Defendants.

## BACKGROUND

The impetus for this civil action is the middle-of-the-night arrest of Mr. Prescott on December 4, 2020, in a house where he was staying with his young children, following domestic

---

[1] This ruling is issued as a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B) and Rule 72(b). Whether a magistrate judge's decision on sanctions is treated as dispositive or nondispositive turns on "the penalty to be imposed, rather than the penalty sought by the movant[.]" *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519-20 (10th Cir. 1995) (citation omitted). Even where a movant requests dispositive sanctions such as dismissal or default, a magistrate judge's refusal to impose a truly dispositive penalty is ordinarily reviewed under Rule 72(a)'s "clearly erroneous or contrary to law" standard. *Id*. Here, out of an abundance of caution and in light of the seriousness of the adverse-inference instruction recommended below, the court proceeds by recommendation so that the district judge may conduct a de novo review under Rule 72(b).

violence allegations made by his then wife, Erika Prescott, to personnel in the Archuleta County

Sheriff's Office ("ACSO"). ECF No. 201 ¶ 4; Second Amended Complaint and Jury Demand,

ECF No. 130 ¶¶ 15-22. The instant spoliation Motion seeks sanctions for the loss of text

messages exchanged between Erika Prescott and Defendant James Martinez, a deputy who

works for the ACSO. A recounting of the tortuous factual and procedural history of this action is

necessary to place Mr. Prescott's request for sanctions in context.

The following facts are derived from the record in this matter, including documents and

testimony provided at the hearing on the Motion and the post-hearing status reports filed in

December 2025 and January 2026[2]:

### A.    May 2019: A Florida Court Grants Custody of the Prescott Children to Mr. Prescott

The Prescotts had long had a strained relationship, resulting in Mr. Prescott initiating a

divorce proceeding in a state court in Florida, where the Prescotts resided at the time. *See Jason*

*Prescott v. Erika Medellin Prescott*, No. 19-010776 (11th Judicial Circuit for Miami-Dade

County, Florida).[3] On May 15, 2019, the Florida state court granted Mr. Prescott's motion to

allow the couple's children "to temporarily reside with the father, Jason Prescott," with Erika

Prescott having "supervised timesharing twice per week on Wednesdays for 3 hours and

Saturdays for 6 hours." ECF No. 201-5 (May 15, 2019 Order) (hereafter, "Custody Order"). It is

---

[2] Unless otherwise noted, the parties do not dispute this information.

[3] It is undisputed that the documents from the Prescotts' divorce proceeding attached to the Motion are true and accurate copies of materials from that state court record. This court takes judicial notice of these state court records. *See, e.g.*, *St. Louis Baptist Temple v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("[I]t has been held that federal courts . . . may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").

undisputed that the Custody Order remained in place at all times pertinent to the instant case, including at the time of Mr. Prescott's arrest on December 4, 2020.

The Prescotts moved to Archuleta County sometime in September 2020, seemingly in connection with an attempt at reconciliation. ECF No. 201 ¶ 11. Things did not go as planned.

**B.      October to December 2020: Erika Prescott and Mr. Martinez Exchange Texts**

On November 29, 2020, Mr. Prescott saw text messages on his wife's cell phone from a contact labeled "James." *Id.* Mr. Prescott made a video recording of at least a portion of those text messages, which this court has reviewed. ECF No. 203 (docket entry reflecting submission of flash drive); *see also* ECF Nos. 201-12, 201-13 (screenshots of the texts discovered by Mr. Prescott). There is no dispute that Erika Prescott's correspondent "James" is Deputy James Martinez, one of the defendants in this matter.

At the evidentiary hearing, Mr. Martinez testified that he first encountered Erika Prescott in a park, sometime in October 2020, where they struck up a conversation related to their mutual interest in dogs. ECF No. 267 at 33:5-13. At some point after that, Mr. Martinez and Ms. Prescott commenced texting, initially about their dogs, ECF No. 201-12[4] at 1-14, and then moving to other topics: what they did on their time off, *id.* at 15-17; the fact that Ms. Prescott was ticketed for a driving infraction by an ACSO officer, *id.* at 18-20; Mr. Martinez's interest in hunting and other hobbies, *id.* at 20-28; the fact that Mr. Martinez was assigned as the school resource officer for the ACSO, where Ms. Prescott saw him when she dropped off her children at

---

[4] In describing the content of the text messages, the court will refer to the screenshots of the messages docketed at ECF Nos. 201-12 and 201-13, some of which are illegible. Non-substantive punctuation alterations have been made here as appropriate for ease of reading.

school, *id.* at 29-30; and other matters related to their personal interests and happenings in the community. *Id.* at 31-60; ECF No. 201-13 at 1-7.

The tenor of the texts changed around November 26, 2020, Thanksgiving Day. On that date, Mr. Martinez asked Ms. Prescott if she had "dress[ed] up for the day?" ECF No. 201-13 at 12. She responded by sending him a photograph of herself in a strapless dress, followed by the comment: "Sorry it's a lot of boob." *Id.* at 13-14. Mr. Martinez replied: "Don't be, stunning to say the least." *Id.* at 13-15. Ms. Prescott then asked Mr. Martinez to call her. *Id..* at 16. Although Mr. Martinez testified that he does not recall if he and Ms. Prescott spoke by phone on Thanksgiving Day, ECF No. 267 at 51:1-7, his Verizon phone records indicate that he received a call on that day from Ms. Prescott's number (786-575-2003) at 3:36 p.m. that lasted twenty-two minutes. *See* ECF No. 263-1 at 12.

A series of text messages were exchanged the day after Thanksgiving, beginning with this one from Ms. Prescott:

> Can you call me—I am sorry I have a question.
> Another hard day.
> He[5] said he has "submitted something to the police"
> I don't know if he's trying to scare me, but he did a lot of that today.

ECF No. 201-13 at 16-17. Mr. Martinez responded: "I have not heard anything. I promise, it's intimidation method. I'm sorry, I wanted to check on you." *Id.* at 17. More texts followed, informing Mr. Martinez that Mr. Prescott had "recked [sic] the house and now wants me to clean it"; accused her of being "a bad mom"; and "literally poured water all over our bed before bed the other night." *Id.* at 19. Ms. Prescott told Mr. Martinez: "I need to get out of this. I have to."

---

[5] It is undisputed that "he" refers to Mr. Prescott.

*Id.* Mr. Martinez responded that the situation was "terrible. You don't need to deal with that. The babies don't need to see it." *Id.* at 20.

In the texts that followed,[6] Ms. Prescott replied that she was "not a resident here yet so I have to figure out how I can proceed," *id.*, prompting more texts between the two concerning Ms. Prescott's residency status in Colorado. *Id.* at 22-28. Ms. Prescott told Mr. Martinez that she was glad she had met him, to which Mr. Martinez responded: "Me too. You're a great woman." *Id.* at 27-28. Mr. Martinez asked Ms. Prescott if she had a plan, to which she responded: "Don't have a plan. Just realizing I might need one. I didn't see any of this coming. He's like this in waves – hot cold . . ." *Id.* at 29. In subsequent texts, which appear to have been sent the same day, Ms. Prescott proceeded to detail other conduct allegedly undertaken by her husband, including his removal of a door knob from her personal closet because "he said I am not allowed to have personal privacy," *id.* at 34-35, and that he had "convinced himself that [Ms. Prescott] met someone to try and accuse him of something." *Id.* at 36.

To these texts, Mr. Martinez responded:

> Separate yourself from him. Create distance and promote silence. It will provoke him and make sure to record.

*Id.* at 40. Mr. Martinez testified that this advice was not intended to encourage provocation but to deescalate the situation by creating separation, similar to his standard guidance for domestic violence situations or other conflicts, and that he recommended recording as a way to document evidence if the situation escalated. ECF No. 267 at 52:13-53:5.

---

[6] The screenshots do not always indicate the precise date and time on which each of the texts was exchanged, but they obviously predate the video made by Mr. Prescott on November 29, 2020, the Sunday after Thanksgiving.

Also included among the texts was a statement that Mr. Martinez was finishing

remodeling work on his home and that it would be completed "I'm hoping the beginning of the

year," *id.* at 32, eliciting this response from Ms. Prescott. "Today [Mr. Prescott] said he is going

to foreclose this house to make it look like he is broke. Sooooo if he does I will def[initely] have

to move. Beginning of the year might be great timing." *Id.* at 32. Mr. Martinez testified that this

exchange could imply Ms. Prescott was discussing moving into his home, but that he had no

such intentions and does not recall it that way. ECF No. 267 at 48:17-49:19.

Ms. Prescott proceeded to tell Mr. Martinez that she had locked herself in her bedroom,

that Mr. Prescott "keeps provoking me. It's been 3 days straight." ECF No. 201-13 at 42. Ms.

Prescott "wonder[ed] if he is under psychosis," and told Mr. Martinez that "he hates me because

I've called the cops on him before." *Id.* at 43. Further, per Ms. Prescott's statements to Mr.

Martinez, Mr. Prescott "keeps whispering 'snitches get stitches.'" *Id.* at 44. Mr. Martinez advised

Ms. Prescott to "write these things out in a journal day by day. It will play a factor in court." *Id.*

at 45.

More accusations of threatening conduct by Mr. Prescott followed, *id.* at 45-51,

prompting Ms. Prescott to text: "OMG. God wake me up from this nightmare." *Id.* at 52. Mr.

Martinez told Ms. Prescott to "video him if he destroys anything, *id.* at 52, and urged her to

"walk away totally. It's best." *Id.* at 54. The last available texts from Ms. Prescott to Mr.

Martinez, which are undated, said that "I'm doing laundry – and my son just came running in

here. I don't know what the hell to do. I'm keeping them on the opposite side of the house. If I

leave he will try to stop me." *Id.* at 59.

This was the last text Mr. Prescott was able to record on November 29, 2020, and that is

contained in the record currently before the court, but Defendants do not dispute that there may

have been—and it appears there likely were—additional texts exchanged between Mr. Martinez

and Ms. Prescott after that date. At some unidentified point, per Mr. Martinez's testimony, he

stated that he stopped texting with Ms. Prescott because he perceived her to be a victim of

domestic violence and felt it was inappropriate to continue communicating with her. ECF No.

267 at 84:9-22. Mr. Martinez denies any romantic intent in the texts, describing them as casual

and friendly. *Id*. at 35:1-4, 40:5-13.

C.     **December 2, 2020, at 1:30 p.m.: Ms. Prescott Makes a Report to ACSO Personnel and Accuses Mr. Prescott of Domestic Violence**

At approximately 1:30 p.m. on December 2, 2020, Ms. Prescott made a report to Patrick

Smith, who worked for the ACSO, alleging that she and her children were the victims of

domestic violence perpetrated by Mr. Prescott. *See* December 2, 2020 Incident/Offense Report,

No. S20000899, ECF No. 201-2 (time of report labeled "1329"). Based on Ms. Prescott's report,

Mr. Smith presented an affidavit and arrest warrant for Mr. Prescott to a state judicial officer. *Id.*

at 3. Sometime on December 2, 2020, the judge issued a warrant for the arrest of Mr. Prescott on

charges of domestic violence, false imprisonment, harassment, and obstruction of telephone or

telegraph services. ECF No. 201-3.

In his deposition in this action, Mr. Smith testified that Ms. Prescott mentioned "James"

several times during the interview. Deposition of Patrick Smith, ECF No. 201-21 at 49:12-16.

Mr. Smith believed that "James" was Mr. Martinez. *Id.* at 149:11-17. Mr. Smith observed that

Ms. Prescott was texting with a "friend" during the course of the interview, but he "didn't look at

[Ms. Prescott's] phone," nor did he speak with Mr. Martinez in the course of investigating Ms.

Prescott's domestic violence report. *Id.* at 149:12-50:7. At the evidentiary hearing in this case,

8

Mr. Martinez testified that he did "not remember any text or calls of that nature"—that is,
concerning Ms. Prescott going to the Sheriff's department to make a report against Mr. Prescott
on December 2, 2020, *see* ECF No. 267 at 63:6-22—but the information in the record indicates
that the two were in communication at that time.

Although Mr. Martinez was away from work "from the end of November until December
15th" because he contracted COVID-19, *see* ECF No. 234-4 at 109:24-110:1, his Verizon phone
records show a ten-minute incoming call from Ms. Prescott's number (786-575-2003)
commencing at 1:42 p.m. on December 2, 2020—immediately before Ms. Prescott was
interviewed by Mr. Smith. Mr. Martinez claims not to recollect this call, but he acknowledges
the records indicate it did in fact occur. *See* ECF No. 263-1 at 13; *see also* ECF No. 267 at 66:9-
67:23; ECF No. 201-1 at 1 (Dispatched Call Summary showing Smith called Prescott at 1:33
p.m. and was en route to meet her at 1:42 p.m.). Mr. Martinez denied coaching Ms. Prescott as to
what to say to Mr. Smith. ECF No. 267 at 67:6-9.

**D.      December 2, 2020, at 4:52 p.m.: Sheriff Valdez Is Advised of the Custody
Order and the Existence of Texts Between Ms. Prescott and "James"**

Mr. Prescott's counsel contacted Sheriff Valdez the afternoon of December 2, 2020, the
day Ms. Prescott made the report of domestic violence. In a letter from attorney Lisa Ward to
Sheriff Valdez, appended to an email sent to the Sheriff at 4:52 p.m., Ms. Ward stated that she
was reaching out "because some extremely concerning issues have been brought to light
involving one of your deputies, a Deputy with the first name James, vehicle no. 177, cell no.
970-398-1754, which issues must be expeditiously addressed by the Department." ECF No.

201-9 at 2.[7] Ms. Ward went on to say that Mr. Prescott had "discovered text messages between Ms. Prescott and Deputy 'James,' which text messages demonstrate that Ms. Prescott is clearly attempting to seduce the Deputy, laying the groundwork for further false allegations against Mr. Prescott." *Id.* Sheriff Valdez testified that he had no doubt that the "James" referenced in Ms. Ward's letter was Defendant James Martinez. ECF No. 267 at 121:10-23.

Ms. Ward appended the Custody Order to her letter to Sheriff Valdez, ECF No. 201-9 at 11-12, along with an "Order for Social Investigation and Psychological Evaluations" issued by the court in the Prescotts' Florida divorce proceeding. *Id.* at 4-9; *see also id.* at 5 (statement by the judge that the court "is very concerned" about circumstances surrounding a May 2019 domestic violence accusation by Erika Prescott against Jason Prescott, which involved Ms. Prescott disabling home security cameras approximately one hour prior to her reporting "the alleged domestic violence incident"). Sheriff Valdez responded to Ms. Ward by email at 9:27 a.m. on December 3, 2020, advising her that "[t]he information will be turned over to my Operations Commander"—i.e., Ms. Lattin—"for a full review." ECF No. 201-22; *see also id.* (copying James Woodman,[8] Warren Brown, and others).

**E.      December 3, 2020, at 10:27 a.m.: Sheriff Valdez Is Again Advised of the Custody Order**

On December 3, 2020, at 10:27 a.m., Ms. Ward sent another email to Sheriff Valdez, along with other ACSO personnel, regarding the "Prescott Children." ECF No. 201-23 (copying

---

[7] It appears that when Ms. Ward sent this correspondence to Sheriff Valdez she was unaware of Ms. Prescott's report to Mr. Smith earlier that afternoon.

[8] Defendant Derek Woodman's full name is James Derek Woodman. *See* ECF No. 201-17 at 1.

James Woodman and others). Ms. Ward attached another copy of the Custody Order to her

email, *id.* at 3-4, and proceeded to address Ms. Prescott's domestic violence report to Mr. Smith:

> I understand that Mrs. Prescott is attempting to file "kidnapping" charges against
> Mr. Prescott for the parties' two minor children. Although I have sent this Court
> Order to you previously, I wanted to re-send it and reiterate that Mrs. Prescott has
> supervised parenting time only, per the Court Order attached which is the only
> Court Order in place related to the Prescott children. Mr. Prescott has sole primary
> parenting of the children so under no circumstances has he "kidnapped" the
> children.
> . . .
> I am asking that you please ensure that your officers understand the situation and
> the current Orders of the Court so that my client is not wrongfully accused and/or
> pursued for kidnapping . . .

*See id.* at 1.

> **F.      December 3, 2020, at 12:00 p.m.: The Colorado Bureau of Investigation
> Denies Mr. Smith's Request for an AMBER Alert for Mr. Prescott**

On December 3, 2020, at approximately noon, a Colorado Bureau of Investigation

official informed Mr. Smith "that given the time line and the circumstances of the case that it

was not likely an AMBER Alert could be issued in this case" that Ms. Prescott had initiated.

ECF No. 201-24 at 2. The CBI official noted in her report that she had "advised [another agent]

of the request," and that "[o]ne item we talked about at length was the fact that dad was in fact

the biological and one of the custodial parents to these children." *Id.*

> **G.      December 4, 2020, at 1:37 a.m.: Mr. Prescott Is Arrested in Colorado Springs**

On December 4, 2020, at 1:37 a.m., Mr. Prescott was arrested at the home of friends in

Colorado Springs[9] by the Colorado Springs Police, after ACSO officials advised the Department

---

[9] Mr. Prescott's children were in the home at the time of his arrest.

11

that Mr. Prescott was believed to be at that location. *See* Case Report # 2020-00042007, ECF No.

201-1. Mr. Prescott was taken into custody. The criminal charges against Mr. Prescott were

ultimately dismissed on January 6, 2021. *See* ECF No. 201 ¶ 37.

**H.    December 4, 2020: Sheriff Valdez Receives a Preservation Request for the Texts**

On December 4, 2020, at 3:03 p.m., Ms. Ward sent an email to Sheriff Valdez, with a

copy to James Woodman, requesting the preservation of electronic evidence and specifically

referencing the texts between Mr. Martinez and Ms. Prescott:

> Sheriff, please consider this my request for you to preserve all electronic and other
> evidence related to any communications between any Deputy in the Department,
> including the Deputy by the names of "James" with cell phone number *970-398-
> 1754* and Erika Prescott, including any and all texts, electronic communications,
> emails, call logs and call records and any other documentation of any and all
> communications between anyone in the department, including but not limited to
> "James," and Erika Prescott. **Such evidence will be the subject of a forthcoming
> subpoena and is relevant to Jason Prescott's defense in the criminal charges
> which have been filed against him**.

ECF No. 201-25 at 1 (italics in original) (bolded emphasis added).

**I.    December 8, 2020: The District Attorney Receives a Preservation Request for the Text Messages From Mr. Prescott's Counsel**

On December 8, 2020, at 2:01 p.m., Mr. Prescott's criminal defense counsel sent an email

to Alex Lowe, an assistant district attorney handling the criminal case against Mr. Prescott. Mr.

Prescott's attorney wrote:

> I am formally requesting additional discovery in case #20CR119. We are aware
> that Ms. Prescott was in communication with a Deputy with the Archuleta County
> Sheriff's Office by the name of  "James" with a cell phone number of 970-398-
> 1754. We believe that there may be exculpatory information contained in the
> communications between "James" and Ms. Prescott. Specifically, we believe there

may be evidence of inappropriate communications between those individuals contained therein.

Please provide any and all communications between Erika Prescott and any member of the Archuleta County Sheriff's Office. These include all texts, electronic communications, recordings, emails, records of call history, call logs, and call records that may exist and that may be in the possession of the Office or a[n] individual deputy or other person associated with the Office.

To be clear, we are requesting that you actively investigate and **take affirmative steps to secure this evidence**.

ECF No. 201-26 (emphasis added). Within two minutes, Mr. Lowe forwarded that email to Warren Brown, Roxanne Lattin, Michael Sindelar, and others. *See id.*

### J.      Unknown Date in Early December 2020: Mr. Martinez Disposes of the Cell Phone that Contained the Texts, Then Provides Inconsistent Information About the Date of Disposal

By December 8, 2020, both the ACSO and the District Attorney had been expressly told that the text messages between Erika Prescott and Deputy "James" were potentially exculpatory and needed to be affirmatively secured. ECF No. 201-25 (December 4, 2020 preservation email to Valdez); ECF No. 201-26 (December 8, 2020 preservation request to DA Lowe). George Daniels, an investigator, was then assigned by the District Attorney's Office to contact Mr. Martinez about his communications with Ms. Prescott.

On December 10, 2020, Mr. Daniels interviewed Mr. Martinez by phone. Mr. Martinez admitted that he had exchanged text messages with Ms. Prescott and that those messages concerned "criminal law and stuff like that, issues that she was having with her husband," but characterized the communications as "pretty minimal." ECF No. 201-10 at 1-2; ECF No. 267 at 14:18-16:7 (Daniels's testimony). Mr. Daniels memorialized in his written report that Mr.

Martinez told him he "would go through his phone and see if he still had" the text messages and would send screenshots of the texts if he did. ECF No. 201-10 at 2.[10] At no point in the December 10 call did Mr. Martinez tell Mr. Daniels that he had recently changed phones, that he had changed his number, or that the device that contained the texts was gone. Mr. Daniels understood from the conversation—and from Mr. Martinez's request that Mr. Daniels keep his cellphone number "private"—that Mr. Martinez was still using the same personal number (970-398-1754) on December 10, 2020, that he had used in texting with Ms. Prescott. ECF No. 201-10 at 2; ECF No. 267 at 18:12-19:4, 30:24-31:6.

Five days later, on December 15, 2020, Ms. Lattin, the ACSO Operations Commander, interviewed Mr. Martinez at the direction of Undersheriff Woodman. In her contemporaneous memorandum, Ms. Lattin recorded that Mr. Martinez told her he had given Ms. Prescott his "personal cell number 970-398-1754," but that he "no longer had that phone number and had changed his personal phone number because of personal reasons involving altercations with his family members." ECF No. 201-29 at 2. Ms. Lattin also wrote: "Deputy Martinez had previously changed his personal cellphone number and no longer had any records of the texts." *Id*. Thus, as of December 15, 2020—eleven days after Mr. Prescott's arrest and after two written preservation demands—Mr. Martinez was claiming that his phone number and any record of his texts with Ms. Prescott were gone, even though he had said nothing about a new device or a new phone number when he spoke with Mr. Daniels on December 10, 2020.

---

[10] It is unclear why Mr. Daniels would have been satisfied with "screen shots" of the texts in light of defense counsel's assertion that they may have contained exculpatory information in a pending criminal case. However, the recording of the call reflects that Mr. Daniels took a very non-confrontational approach with Mr. Martinez and did not press him for information.

Mr. Martinez's account shifted again during the course of the instant litigation, when District Attorney Sean Murray asked Mr. Daniels to re-interview Mr. Martinez in October 2024 after learning that Mr. Martinez might have destroyed evidence. ECF No. 267 at 19:7-22:24. In that second recorded interview, Mr. Martinez told Mr. Daniels that he "often" changed phones through Straight Talk/Verizon, taking advantage of Black Friday or Cyber Monday promotions, and that by the time of the December 10, 2020 interview he had "a new phone" but had kept the same number. ECF No. 267 at 20:10-21:6. That explanation is difficult to reconcile with Mr. Martinez's December 15, 2020 statement to Ms. Lattin that he no longer had the texts with Ms. Prescott because he had changed his personal number due to "altercations with his family members."

Mr. Martinez's testimony at the November 2025 evidentiary hearing added further inconsistency to the timeline concerning his phone. He testified that he believed he had obtained a new phone—"by at the latest"—December 1, 2020, via a Verizon promotion, but he could not say from which store or whether there were credit-card or bank records reflecting the purchase, even though he agreed such records "logically" should exist. ECF No. 267 at 141:16-143:11. He professed not to remember what he did with the old device that contained the Prescott texts, stating only that he "could have just got rid of it, sold it, sent it back," and that he now has "no idea where the phone was." *Id.* at 143:12–144:3. He also testified that when Mr. Daniels called him on December 10, 2020, he was already using the new phone, that the new phone started as a "clean device" with no historical texts on it, and that when he looked at the phone after hanging up with Mr. Daniels "there was nothing there." *Id.* at 144:20-145:5, 159:3-160:6.

15

At the same time, Mr. Martinez acknowledged that (1) he did not tell Mr. Daniels during their call on December 10, 2020, that he was on a different physical phone than the one on which he had communicated with Ms. Prescott; (2) he did not disclose that fact until years later; and (3) he had changed his number "three times" since late 2020, including once within about five days after speaking with Mr. Daniels, ostensibly because of a dispute with his brother. *Id.* at 152:19-153:14, 173:15-174:6. He further testified that he does not keep old phones, that there is "just no need to," and that he cannot say whether any of the data from the phone on which he communicated with Ms. Prescott was ever backed up or remained in iCloud. *Id.* at 143:17-144:3, 147:18-149:6, 161:1-162:9.

Taken together, this sequence of events supports the conclusion that, within days of ACSO personnel being put on explicit notice—by both Mr. Prescott's criminal defense counsel and the District Attorney's Office—that Mr. Martinez's texts with Ms. Prescott were relevant and needed to be preserved, Mr. Martinez disposed of that phone and then, when asked about the phone and the texts, gave inconsistent, incomplete explanations about when he got rid of it, whether he changed his number, and whether any of the data was transferred or preserved.

### K.     January 7, 2021: Mr. Prescott's Counsel Submits Another Preservation Request to Sheriff Valdez

In this preservation letter, entitled "Demand for Evidence Preservation," counsel for Mr. Prescott notified Sheriff Valdez and Pagosa Springs Chief of Police Bill Rockensock of their demand to immediately "preserve all documents and tangible things . . . related to any of the above-named individuals": Jason Prescott, Erika Prescott, and James Martinez. ECF No. 201-27 at 3. The letter defined "documents and tangible things" to include texts. *Id.*

16

**L.** **This Court's Efforts to Clarify the Timeline of Mr. Martinez's Disposal of His Phone and to Determine if the Missing Texts Could Be Retrieved**

In its November 7, 2025 order, this court found the existing record as to when Mr. Martinez discarded his phone, acquired a new device, and changed his number "convoluted, vague, and—in some respects—contradictory," ECF No. 261 at 3—a characterization to which the undersigned continues to adhere. In an attempt to eliminate this confusion, the court ordered Mr. Martinez to produce either a receipt for the "Black Friday/Cyber Monday" phone purchase or, failing that, complete credit card and other payment records for November 2020 through January 2021, and directed defense counsel to review those records and file a status report "confirming the date on which the new device was purchased"—or explaining why that could not be done. *Id*. at 3-4.

Defendants' December 8, 2025 Status Update Regarding Date of Phone Purchase reported that Mr. Martinez's bank records showed a $248.91 payment to Verizon on December 7, 2020, which "upon information and belief, includes an installment charge for the phone," but asserted that counsel could not determine the exact purchase date from the available billing and account records. ECF No. 266 at 2-3. Defendants acknowledged there were no receipts or order confirmations in Mr. Martinez's email and that his practice of financing phones in installments made it "difficult to distinguish between service charges versus an installment plan on a new phone" from billing alone. *Id*. at 3-4.

The court also observed in its November 7, 2025 order that "not all avenues have been exhausted" to recover the lost texts, and accordingly directed Defendants to retain a qualified forensic examiner to determine whether any text/iMessages between Mr. Martinez and Ms. Prescott could be retrieved from the cloud or other sources, with any recoverable texts to be

17

produced to Plaintiffs and the examiner's conclusions reported within sixty days. *Id.* at 2-3.

Defendants retained an entity called Contact Discovery Services and digital forensics analyst

Sean Sears, who first performed an advanced logical extraction of Mr. Martinez's iPhone 14 Pro

Max and then, after resolving Apple security lockouts, collected two iCloud backups and synced

iMessages from Mr. Martinez's iCloud account. ECF No. 280-1 at 2-3; ECF No. 281-1 at 2.

After analyzing the device image, the two backups, and the iCloud-synced iMessages with

industry-standard forensic tools, Mr. Sears reported that he "could not identify any iMessages on

the device" or in the iCloud data to or from Ms. Prescott's phone number or email, and that the

earliest recovered messages post-dated the relevant September to December 2020 period. ECF

No. 280-1 at 3.

**LEGAL STANDARDS**

Rule 37(e) governs the imposition of sanctions when "electronically stored information

that should have been preserved in the anticipation or conduct of litigation is lost because a party

failed to take reasonable steps to preserve it, and it cannot be restored or replaced through

additional discovery[.]" Fed. R. Civ. P. 37(e). "A moving party has the burden of proving, by a

preponderance of the evidence, that the opposing party failed to preserve evidence or destroyed

it." *Zbylski v. Douglas Cnty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1160 (D. Colo. 2015) (citing

*Ernest v. Lockheed Martin Corp*, No. 07-cv-02038-WYD-KLM, 2008 WL 2945608, *1 (D.

Colo. July 28, 2008)). "To carry this burden, [the moving party] must show that 'the existence of

a fact is more probable than its nonexistence.'" *United States v. Crockett*, 779 F. App'x 536, 540

(10th Cir. 2019) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.

for S. Cal.*, 508 U.S. 602, 622 (1993)).

18

If the court concludes that evidence was not preserved and that the moving party suffered prejudice from the loss of the evidence, the court "may order measures no greater than necessary to cure the prejudice[.]" Fed. R. Civ. P. 37(e)(1). But if the court finds "that the party acted with the intent to deprive another party of the information's use in the litigation[,]" the court may "(A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e)(2).

"As a general rule, '[s]poliation sanctions are proper when (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *EEOC v. JetStream Ground Servs., Inc.*, 878 F.3d 960, 964 (10th Cir. 2017) (quoting *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009)); *see also, e.g.*, *Zbylski*, 154 F. Supp. 3d at 1170-71 ("Spoliation sanctions are proper when the court determines that a party had a duty to preserve relevant evidence, and the adverse party was prejudiced by the destruction of the evidence.") (citing *Burlington N. & Santa Fe Ry. Co. v. Grant,* 505 F.3d 1013, 1032 (10th Cir. 2007)). Additionally, to impose an adverse inference to remedy the spoliation, the court must find bad faith. *Zbylski*, 154 F. Supp. 3d at 1171-72 (stating that "[w]here the party claiming prejudice seeks an adverse inference to remedy the spoliation, it must also prove bad faith"). As the Tenth Circuit Court of Appeals has noted, "[t]he advisory committee note to [Rule 37(e)(2)] provides a commonsense explanation for the bad-faith requirement":

> Adverse-inference instructions were developed on the premise that a party's intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was unfavorable to the party responsible

19

for loss or destruction of the evidence. Negligent or even grossly negligent behavior does not logically support that inference.

*Jetstream Ground Servs.*, 878 F.3d at 966 (quoting advisory committee note to 2015 amendment). Thus, without a showing of bad faith, a district court may only impose lesser sanctions. *Turner*, 563 F.3d at 1149.

## ANALYSIS

Mr. Prescott requests that the court enter default judgment against Defendants for failing to preserve evidence in violation of Rule 37(e)(2). He presses the conclusion that default judgment is the only remedy that sufficiently redresses the loss of the texts between Mr. Martinez and Ms. Prescott, particularly in view of Defendants' status as law enforcement officers. *See* ECF No. 201 ¶¶ 13, 53-5. He disputes that even an adverse-inference instruction is adequate to address the prejudice he has sustained, distinguishing cases in which an adverse-inference instruction has been found to be an appropriate sanction as "not involv[ing] law enforcement officers who are *required to preserve evidence anyway*, and who intentionally deleted the evidence they were told four times they needed to preserve and produce." *See id.* ¶ 62 (emphasis in original).

The theme underlying Defendants' counterarguments is that it isn't Mr. Martinez's fault his text messages with Ms. Prescott post-dating November 29, 2020, were lost. The reason Mr. Martinez can't be held to account for their loss is that (1) he had "absolutely no involvement or input" in the criminal investigation of Mr. Prescott that was initiated with Ms. Prescott's report on December 2, 2020, and he "had no idea that Plaintiff had even been arrested until the DA investigator contacted him on December 10, 2020," ECF No. 234 at 3, 8; (2) the instant litigation was not "reasonably anticipated" when he replaced Mr. Martinez replaced his cell phone and cell

20

phone number on an unknown date and time in the early days of December 2020 (but, clearly, after December 2, 2020, when he talked with Ms. Prescott immediately preceding her interview with Mr. Smith), *id.* at 7-8; (3) "*Deputy Martinez*" was never put on notice to secure the texts "because he was in quarantine on sick leave" during the first two weeks of December 2020, *id.* at 9-10 (emphasis in original); and (4) by the time Mr. Martinez returned to work on December 16, 2020, and he was interviewed by Operations Commander Lattin, the text messages "had been lost" because Mr. Martinez had not theretofore "learn[ed] of any open case involving Mr. Prescott." *Id.* at 11.

The court is, respectfully, wholly unpersuaded by Defendants' arguments, which conspicuously fail to engage with the totality of the record evidence and are, in multiple respects, directly contradicted by it. In particular, Defendants fail to address the evidence indicating that—irrespective of Mr. Martinez's actions with regard to his cell phone (concerning which, the court notes, he has testified inconsistently)—no ACSO official with knowledge of the communications from Mr. Prescott's counsel, including Sheriff Valdez, ever contacted Mr. Martinez to tell him that he needed to preserve text messages with the reporting party in a domestic violence case in which the ACSO was pursuing charges at that very point in time.

Upon a careful examination of the record evidence pursuant to the applicable standards for evaluating spoliation, the court concludes the missing texts are spoliated evidence and that prejudice to Mr. Prescott may be repaired by means of an adverse-inference instruction.

### A.    Discussion

#### 1.    Defendants Had a Duty to Preserve the Texts

To commence with the key point, "[l]itigants must preserve evidence when they have

21

notice or should know that evidence may be relevant to future litigation." *Eze v. City of Las Cruces*, No. 1:23-CV-00976-KWR-KRS, 2025 WL 2962609, at *2 (D.N.M. Oct. 20, 2025) (citing *Browder v. City of Albuquerque*, 209 F. Supp. 3d 1236, 1243 (D.N.M. 2016)).

Here, Defendants received notice that the texts were relevant to a criminal case that had already commenced. In Ms. Ward's letter to Sheriff Valdez, which she sent at 4:52 p.m. on December 2, 2020, she conveyed that "some extremely concerning issues have been brought to light" concerning a "James," evinced in his text messages with Ms. Prescott that reflected her attempts "to seduce the Deputy, *laying the groundwork for further false allegations against Mr. Prescott*." ECF No. 201-9 at 2 (emphasis added).[11] Indeed, just three hours earlier, Ms. Prescott had in fact made a report of domestic violence against Mr. Prescott, eliciting from ACSO officials efforts to procure his arrest at the exact time the letter was sent. By the time Sheriff Valdez saw the letter on the morning of December 3, he was aware that the ACSO had already procured a warrant for Mr. Prescott's arrest. ECF No. 267 at 92:20-25.

Sheriff Valdez testified that he forwarded the December 2 letter to his "command staff," i.e., Undersheriff Woodman and Ms. Lattin. ECF No. 267 at 91:7-23. But he took no other action in response to the information contained in the letter at that time, *id.* at 91:24-25, including doing nothing to ensure that Mr. Martinez's text messages were preserved:

> Q.    Who did you direct to get the text messages that day [December 3, 2020]?
> A.    The text messages, I didn't direct anybody specifically for the text messages . . . . What I did direct them is to conduct an Internal Affairs investigation or to start looking into the matter.

---

[11] There was no doubt in Sheriff Valdez's mind that the "James" referred to in the December 2, 2020 letter was James Martinez. ECF No. 267 at 121:5-8.

*Id.* at 96: 14-18. Sheriff Valdez understood that the text messages were "potential evidence" that

"needs to be secured." *Id.* at 98:11-19. Sheriff Valdez went on to testify:

> Q.    And the letter also says that Ms. Prescott is premeditating further false
>       allegations and has enlisted the assistance of Sheriff's Deputy who has now
>       knowingly or unknowingly become involved in Ms. Prescott's schemes to
>       falsify yet another arrest of Mr. Prescott. You see that language, don't you?
> A.    Yes.
> Q.    And so those text messages were exculpatory or at least they very well could
>       be, correct?
> A.    Yup.

*Id.* at 98:20-99:3; *see also id.* at 183:24-184:2 (testimony from Undersheriff Woodman

acknowledging that the texts had "evidentiary value").

Lest Sheriff Valdez harbored any doubt as to the need to preserve Mr. Martinez's texts—

and his testimony confirms that he had no doubt as of the morning of December 3 that the texts

constituted potentially exculpatory evidence in a pending criminal matter—that belief could not

have been rationally sustained as of December 4, 2020, when Mr. Prescott's counsel sent a

preservation request for the texts. In that communication, counsel expressly demanded

preservation of "all electronic communications" between any ACSO deputy (including "the

Deputy by the name of James with cellphone No. *970-398-1754*)" and Ms. Prescott, and stating

that "[s]uch evidence will be the subject of a forthcoming subpoena and is relevant to Jason

Prescott's defense in the criminal charges which have been filed against him." ECF No. 201-25

at 1 (italics in original); ECF No. 267 at 106:6-8 (testimony by Sheriff Valdez acknowledging

that the December 4 letter requested preservation of the texts).

On this record, the court is compelled to find that ACSO officials were on notice that

steps should have been taken to preserve these potentially exculpatory texts by no later than

23

December 3, 2020. At that point, the officials were in possession of information indicating that

an ACSO deputy could be connected to a pending criminal investigation and possible "false

accusations" against the target of that investigation, thus creating a duty to preserve the texts. By

any commonsense standard, Sheriff Valdez immediately should have known that the texts must

be preserved. *See, e.g.*, *Sims v. Bd. of Cnty. Commissioners for Oklahoma Cnty.*, No. CIV-23-

780-R, 2026 WL 288199, at *2 (W.D. Okla. Feb. 3, 2026) (recognizing, in evaluating whether

preservation of electronically-stored information should have been preserved in anticipation of

litigation, that Rule 37(e) encompasses "potential future litigation *or criminal action*") (emphasis

added); *Crema v. Las Vegas Metro. Police Dep't*, No. 2:17-cv-01535-RFB-VCF, 2023 WL

6262556, at *4 (D. Nev. Sept. 25, 2023) (holding that "the body camera footage was foreseeably

material and relevant evidence in both [the plaintiff's] pending criminal proceedings and future

litigation, including this civil case") (citing *Ungar v. City of New York*, 329 F.R.D. 8, 14 n.2

(E.D.N.Y. 2018), *aff'd*, No. 21-1384-cv, 2022 WL 10219749 (2d Cir. Oct. 18, 2022) ("Where it

is foreseeable that evidence may be relevant to a criminal proceeding, the State's failure to

preserve it can support an adverse inference instruction in a civil proceeding arising out of the

same events.") (other citation omitted)); *see also Zbylski*, 154 F. Supp. 3d at 1163 (stating that

"evidence gathered during the course of a prior criminal investigation was subject to a duty to

preserve based on the reasonable foreseeability of a criminal prosecution").

The court is respectfully unpersuaded by Defendants' arguments seeking to extricate

themselves from this preservation obligation. Defendants assert that, "[w]hen the texts were lost,

there was no active litigation, and no anticipation of litigation." ECF No. 234 at 7-8. Not so. The

criminal charges against Mr. Prescott were pending when Mr. Martinez got rid of his phone

(under circumstances that remain hazy, despite this court's efforts to obtain specific information as to the date when that occurred). Furthermore, given the unequivocal contemporaneous representations from Mr. Prescott's counsel—that Mr. Prescott, not his wife, was the children's legal custodian and that his wife had a history of falsely accusing him of domestic violence—it also could reasonably have been anticipated that Mr. Prescott would bring a civil action alleging that Defendants' pursuit of his arrest and prosecution violated his constitutional rights. The plain language of the communications from Mr. Prescott's counsel signaled his belief that Defendants' actions were even then running afoul of the Constitution.

Likewise must the court respectfully disagree with Defendants' contention that, when Mr. Martinez got a different cell phone, "there had not even been a report made to investigate [Mr. Prescott] at that point in time." *Id.* at 8. Indeed, the evidence indicates that Mr. Martinez had a ten-minute conversation *on his old cell phone* with Ms. Prescott just as she was preparing to tell her story to Mr. Smith on December 2, 2020, at 1:42 p.m. ECF No. 263-1 at 13. The proposition that Mr. Martinez had no knowledge of the report Ms. Prescott would imminently make, or the outcome of her conversation with Mr. Smith (including the plan to issue a warrant for Mr. Prescott's arrest), is simply not credible, and the court declines to countenance it. But even if it were the case that "*Deputy Martinez* was not put on notice on December 2, 2020, because he was in quarantine on sick leave," ECF No. 234 at 9 (emphasis in original), that reflects an overly simplistic and unduly narrow construction of the preservation obligation. Per Sheriff Valdez's testimony, he and his command staff knew on December 3, 2020 that Mr. Martinez might have been in possession of exculpatory evidence; the court finds that sufficient to create a preservation obligation, even if Mr. Martinez claims to have been personally ignorant of the repeated notices

from Mr. Prescott's counsel that texts between "Deputy James" and Ms. Prescott were relevant evidence from the perspective of the person against whom criminal charges were then pending.

Accordingly, the court finds that the texts between Mr. Martinez and Ms. Prescott should have been preserved, and that information conveying that preservation obligation was known to ACSO officials by December 3, 2020.

### 2. Defendants Failed to Take Reasonable Steps to Preserve the Texts

Once a duty to preserve evidence attaches, as the court finds it attached here on December 3, 2020, a party must take reasonable steps to preserve evidence. Fed. R. Civ. P. 37(e).

Here, rather than taking reasonable steps to preserve the texts, Sheriff Valdez—notwithstanding his immediate understanding of the potentially exculpatory nature of the texts—set in motion a chain of events that virtually ensured their being lost. On December 3, 2020, Sheriff Valdez sent the December 2 letter, referencing Mr. Martinez's texts with Ms. Prescott, "over to [his] investigating detective[12] who should have taken it into consideration during the course of their internal investigation." *Id.* at 100: 16-24. Sheriff Valdez assumed that "giving that information to [his] commanding officers, that they would be in contact with [Mr. Martinez] and talking about those [texts]." *Id.* at 107:8-10.

The trouble is, no evidence in the record indicates that these "commanding officers" timely followed up with Mr. Martinez to "talk about" the texts (which were understood to constitute potentially exculpatory evidence), and neither is there evidence in the record

---

[12] It is not precisely clear to whom Sheriff Valdez refers in using the term "investigating detective," but the so-called internal affairs investigation was being conducted by Commander Lattin, Undersheriff Woodman, and "outgoing Commander Brown," ECF No. 267 at 102: 6-9—presumably, Defendant Warren Brown.

demonstrating that Sheriff Valdez took any other steps to confirm that the texts had been secured. Undersheriff Woodman testified that after Sheriff Valdez gave him the December 2, 2020 letter, he "did contact Commander Lattin and had her initiate a *cursory review* of Deputy Martinez's personal cellphone." *Id.* at 180:17-23 (emphasis added). As Undersheriff Woodman explained at the hearing:

> A.    I directed Commander Lattin to attempt to obtain the texts.
> Q.    Do you recall when you directed her to do that?
> A.    Specifically, I do not recall the exact date. I did remember that she – by the time that it all took place, that she had learned that Mr. Daniels through the DA's office had already attempted to secure those texts either the day, a couple days before, something like that, so I'm guessing if the interview is on the 10th, I'm assuming that it is somewhere around December 10th.
> Q.    Did you want Commander Lattin to get those texts on December 3rd of 2020 when you first received this letter?
> A.    I believe that I expected expedience on her efforts to obtain them . . .

*Id.* at 185:10-22. Expedience, Undersheriff Woodman did not get.

The evidence shows that even the "cursory review" of the texts Undersheriff Woodman anticipated never occurred. In her testimony at the evidentiary hearing, Commander Lattin denied that Undersheriff Woodman directed her to secure the text messages, but rather told her just to "look into . . . the inappropriate relationship matter between" between Mr. Martinez and Ms. Prescott. *Id.* at 208:25-209:9. Commander Lattin did not understand herself to be conducting "an Internal Affairs investigation," but rather addressing "just a complaint, inquiry." *Id.* at 211:10-12; *id.* at 211:23-24 (stating that it was "a supervisor inquiry into a complaint. There was not any IA investigation."). Importantly, Commander Lattin did not "demand from Deputy Martinez the production of th[e] text messages," and did not "demand from Deputy Martinez that the text messages be preserved." *Id.* at 212:13-18. Nor, as the record shows, did anyone else.

27

In the end, despite the multiple communications from Mr. Prescott's counsel to Sheriff Valdez and other ACSO officials emphasizing the importance their client ascribed to the Martinez/Erika Prescott texts—and the evidence showing that ACSO officials similarly understood the texts to be of a potentially exculpatory nature—no one ever directed Mr. Martinez to preserve the texts or to turn over his cellphone for a forensic analysis. Pursuant to ACSO policy, the officials were authorized to make that demand, as Mr. Martinez himself acknowledged. *See* Archuleta County Sheriff's Office Policy Manual, *Personal Communication Devices* § 701.5(d), ECF No. 201-38 at 5 ("Employees should understand that the use of personally owned PCD in the workplace for official business may subject them to civil or criminal discovery or disclosures under applicable public records laws."); *see also* ECF No. 267 at 81:10-19 (Martinez testimony regarding the requirements imposed by the policy).[13]

This record reflects a failure by Defendants to take reasonable steps to preserve relevant evidence. Defendants' arguments to the contrary do not undermine this conclusion.

Defendants contend that the ACSO "never had [the texts] to preserve" because Mr. Martinez's personal phone was "not a cellular device owned by the Sherriff's Office" that Mr. Martinez "utilized for work[.]" ECF No. 234 at 11. Perhaps true, but a characterization that

---

[13] Per Mr. Martinez's testimony at the evidentiary hearing:

Q. So you agree with me that these texts as they related to a victim who has made a claim against an actual defendant with a pending criminal case sitting in jail in Colorado Springs, that those texts should have been transferred over to the Archuleta County Sheriff's Office. Do you agree with me on that?
A. That's a long question.
THE COURT: Should you have given your texts over to your employer, sir?
THE WITNESS: If you say it that clear, yes.

ECF No. 267 at 81:10-19.

elevates form over substance. The ACSO was expressly notified that the contents of Mr.

Martinez's phone, albeit his "personal" one, might contain exculpatory evidence related to an

open criminal investigation. Likewise does the court decline to credit Defendants' self-serving

assertion that "[t]he request for copies of the text messages the day Deputy Martinez returned

from sick leave after having COVID-19 was a reasonable attempt to preserve the messages,"

ECF No. 234 at 11—particularly in light of the Sheriff's expressed understanding, as of

December 3, 2020, that the texts were of a potentially exculpatory nature.

Finally, with all due respect, Defendants' assertion that they had "no idea that [the texts]

could be relevant to a future case," *see id.*, cannot be taken seriously in light of the evidence in

the record here. As Sheriff Valdez and Undersheriff Woodman testified, they appreciated the

potential relevance of the texts to a then-pending criminal investigation that in fact resulted in

criminal charges being brought against Mr. Prescott. In those circumstances, Defendants knew,

or should have known, by no later than December 3, 2020, that texts between Mr. Martinez and

Ms. Prescott "were potentially relevant to a reasonably-defined future criminal or civil

proceeding." *See Zbylski*, 154 F. Supp. 3d at 1166. Their assertion now, that it was sufficient for

them to talk with Mr. Martinez when he returned to work on December 16 from his bout with

COVID-19[14] does not absolve them of their obligation to have taken reasonable steps to preserve

the evidence two weeks earlier, when they were placed on notice of the existence of the texts.

---

[14] Defendants' professed reticence to speak with Mr. Martinez because he was down with the
coronavirus does not excuse their failure to secure obviously relevant ESI. There is no evidence
in the record indicating that Mr. Martinez was so lacking in functional capacity that he would
have been unable to communicate with his colleagues about this extremely serious issue. And the
court is obliged to observe that, during the two-week period when Mr. Martinez was away from

In sum, Defendants' delay in taking steps to preserve the texts was not a reasonable response to the December 3, 2020 notification that those texts may constitute exculpatory evidence in connection with an ongoing criminal investigation, that quickly resulted in the filing of criminal charges, and that under any reasonable construction also portended civil litigation. Accordingly, Mr. Prescott has met his burden to show that Defendants did not take reasonable steps to preserve the ESI.

### 3. The Texts Cannot Be Restored or Replaced Through Additional Discovery

The record also demonstrates that the texts "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e).

The record admits of no doubt that the missing texts no longer exist on any device in the possession of Mr. Martinez, are not available from any ACSO system, and cannot now be recovered from any other source. With the intention of exhausting all possible avenues to obtain the texts, this court ordered Defendants to retain a qualified forensic examiner to determine whether retrieval of the lost texts could be accomplished. *See* ECF No. 261 at 3. The retained forensic examiner stated, in two sworn declarations, that the messages could not be retrieved. *See* ECF Nos. 280-1, 281-1.

The court notes Defendants' argument that they "believe" Mr. Prescott is "in possession of all of the text messages at issue here," *see* ECF No. 234 at 11-12, but finds there is not the slightest bit of evidence to support that belief, which seems to hinge on a subpoena issued to

---

work, he apparently was well enough to speak with Ms. Prescott (on December 2, 2020) and, after that, to accomplish the switching out of his phone (on a date that cannot be definitively identified).

Verizon in the Florida divorce proceeding sometime in December 2020. *See id.* at 12. As Mr.

Prescott has correctly observed, a phone provider cannot "produce the content of text messages

even if they are not deleted." ECF No. 239 ¶ 49. In any event, the court rejects Defendants'

unsupported contention that Mr. Prescott actually has the text messages which he has fought with

such tenacity to obtain since December 2, 2020. At bottom, the texts are gone, by virtue of

Defendants' failure to preserve them, and the suggestion that Mr. Prescott actually has the texts

strains credulity to the breaking point.

Therefore, the court finds that the texts that Defendants failed to preserve will of

necessity remain unavailable to Mr. Prescott and can never be replaced by additional discovery.

### 4. Defendants Acted with Intent to Deprive Mr. Prescott of the Use of the Texts in the Litigation

Because Mr. Prescott seeks entry of default judgment as a sanction for Defendants'

failure to preserve evidence, which this court has found they had a duty to preserve and that

cannot now be retrieved, the court next considers whether the texts are missing because

Defendants intended to deprive Mr. Prescott of that relevant evidence in this litigation. *See* Fed.

R. Civ. P. 37(e)(2) (the sanction of default may be imposed for spoliation of electronically-stored

information "only upon finding that the party acted with the intent to deprive another party of the

information's use in the litigation").[15]

---

[15] To the extent Defendants argue that the court must also make a separate and express finding of prejudice, *see* ECF No. 234 at 4, that is inaccurate. *See Peddada v. Catholic Health Initiatives Colorado*, No. 23-cv-01921-NYW-MDB, 2026 WL 35172, at *4 n.5 (D. Colo. Jan. 6, 2026) (observing that "Rule 37(e)(2) does not require a separate finding of prejudice because it is—to some extent—implied.") (citing *Cox v. Swift Transportation Co. of Arizona, LLC*, No. 18-cv-117-CVE-JFJ, 2019 WL 3573668, at *1 (N.D. Okla. Aug. 6, 2019) ("Unlike Rule 37(e)(1), Rule

The Tenth Circuit has directed that "intent" under Rule 37(e)(2) requires a finding of "bad faith." *Jetstream Ground Servs.*, 878 F.3d at 966 ("The adverse inference must be predicated on the bad faith of the party destroying the records. Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case.") (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997)); *see also, e.g.*, *Skanska USA Civil Southeast Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1312 (11th Cir. 2023) (holding that "intent to deprive another party of the information's use in the litigation," as relevant to sanctions under Rule 37(e)(2), "is the equivalent of bad faith in other spoliation contexts") (citing *JetStream Ground Servs.*, 878 F.3d at 965-66); *Stovall v. Brykan Legends, LLC*, No. 17-2412-JWL, 2019 WL 480559, at *3 (D. Kan. Feb. 7, 2019) ("If an aggrieved party seeks an adverse inference jury instruction—as plaintiff does here—that party must also prove bad faith on the part of the producing party.") (quotation omitted).

Because there is rarely direct evidence of intent, an intent to deprive may be found through circumstantial evidence. *N. Am. Science Assocs., LLC v. Conforti*, No. 24-cv-287 (JWB/ECW), 2024 WL 4903753, at *16 (D. Minn. 2024). And in light of the rarity of direct evidence of intent, "a court imposing spoliation sanctions has substantial leeway to determine

---

37(e)(2) does not require an express or separate finding of prejudice because 'the finding of intent required by [Rule 37(e)(2)] can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position.'") (quoting Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment); *Hallum v. Sheriff of Delaware Cnty.*, No. 21-cv-137-GKF-SH, 2023 WL 6367656, at *4 (N.D. Okla. Sept. 29, 2023) ("If intent is found, there is no need to consider prejudice; the finding of intent supports both an inference that the lost information was unfavorable and that the opposing party was prejudiced.")).

intent through consideration of circumstantial evidence, witness credibility, motives of the witness in a particular case, and other factors." *Id.* (internal quotation marks and quotation omitted). The intent-to-deprive standard in Rule 37(e)(2) can be "met if the evidence demonstrates or it is reasonable to infer that a party purposefully destroyed evidence to avoid [its] litigation obligations." *Eze v. City of Las Cruces*, 2025 WL 2962609, at *4 (citing *Franklin v. Stephenson*, No. 20-CV-0576, MIS-JFR, 2022 WL 6225303, at *9 (D.N.M. Feb. 16, 2022), *report and recommendation adopted*, 2022 WL 6103342 (D.N.M. Oct. 7, 2022)).

"Intent is generally found where the party's actions are responsible for the destruction of evidence, and the party "fully appreciated the significance of the evidence to the anticipated litigation." *SA Int'l, Inc. v. S.A. Int'l Israel Ltd*, No. 2:23-CV-00877-HCN-JCB, 2025 WL 3487528, at *8 (D. Utah July 2, 2025) (citing *Oil Equip. Co. v. Modern Welding Co.*, 661 F. App'x 646, 653 (11th Cir. 2016)). "Intent may also be inferred if a party is on notice that the evidence is potentially relevant and fails to take measures to preserve relevant evidence, or otherwise seeks to 'keep incriminating facts out of evidence.'" *Id*. (quoting *Franklin*, 2022 WL 6225303, at *9). "Courts may also consider the timing of the loss of evidence in determining intent." *Id.* (citing *Franklin*, 2022 WL 6225303, at *9).

The record here supports an inference that Defendants possessed the requisite intent under Rule 37(e)(2) because they unequivocally were "on notice that the [texts were] potentially relevant and fail[ed] to take measures to preserve [that] relevant evidence[.]" *SA Int'l, Inc.*, 2025 WL 3487528, at *8. In so finding, the court emphasizes three critical points.

First, the clarity and specificity of the preservation demands distinguish this case from one in which a party merely acts negligently in failing to anticipate litigation. By December 3,

33

2020, Sheriff Valdez and ACSO leadership had been formally notified that: (1) a deputy "James" was texting with Ms. Prescott; (2) "James's" phone number was 970-398-1754; (3) those texts were alleged to show Ms. Prescott "attempting to seduce the Deputy" and thereby laying the groundwork for false allegations against Mr. Prescott, who was even then subject to an arrest warrant issued at the behest of ACSO officials just hours earlier; and (4) the texts were described as containing potentially exculpatory evidence in the pending criminal case against Mr. Prescott. ECF Nos. 201-9, 201-23, 201-40. Indeed, Sheriff Valdez admitted that he had received the letter Ms. Ward sent on December 2, 2020, and that he understood, as of the next morning, that the texts were potentially exculpatory evidence that "needs to be secured." ECF No. 267 at 98:11-19; 298:20-99:3. Undersheriff Woodman, who also reviewed Ms. Ward's letter on December 3, 2020, likewise immediately apprehended that the texts had "evidentiary value." *Id.* at 183:24-184:2. Put simply, this is not a situation where the obligation to preserve was unclear or technical; it was explicitly flagged for Defendants and they "fully appreciated" the point. *See SA Int'l, Inc.*, 2025 WL 3487528, at *8.

Second, Mr. Martinez's explanations regarding his loss of access to the texts has shifted over time in ways that are both inconsistent and self-serving. When Mr. Daniels, the DA investigator, first spoke with Mr. Martinez on December 10, 2020, Mr. Martinez did not reveal that he had changed phones or that his texts had been lost during a device migration. Instead, he told Mr. Daniels that he had texted with Ms. Prescott about her marital problems, that he would look for messages, and then reported that he "did not have any of the text messages." ECF No. 201-10 at 1-2. Mr. Martinez did not tell Mr. Daniels that he had changed his number or that he had a new phone, leaving Mr. Daniels with the impression that Mr. Martinez was then in

possession of the same phone and number on which he had texted Ms. Prescott. ECF No. 267 at 18:24-19:11.

Five days later, in his December 15 interview with Commander Lattin, Mr. Martinez offered a different explanation for his inability to retrieve the texts than the one he had given Mr. Daniels: he told Commander Lattin that he had "changed his personal phone number" because of "personal reasons involving altercations with his family members" and that he "no longer had that phone number" and "no longer had any records of the texts." ECF No. 201-29 at 2. However, Mr. Martinez did *not* tell Commander Lattin that he had obtained a new phone since he had texted with Ms. Prescott. ECF No. 267 at 216:4-6 (Lattin confirming that Martinez told her he had changed his number but not the phone itself). Nor did he suggest to Commander Lattin that he had obtained a new phone on Black Friday or Cyber Monday. *Id.* at 217:22-25.

Mr. Martinez told yet a different story about his phone during a second interview with Mr. Daniels on October 1, 2024. Mr. Daniels interviewed Mr. Martinez at that time at the request of Sean Murray, the La Plata County District Attorney, who informed Mr. Daniels "that he had heard that Sgt. Martinez had deleted text messages and destroyed his cellphone after our conversation on December the 10th, 2020. District Attorney Murray asked me to contact Sgt. Martinez and ask him about that." *Id.* at 19:12-22.

Only during that October 1, 2024 interview with Mr. Daniels—nearly four years after the first interview and after three years of litigation in the instant civil case—did Mr. Martinez first articulate the "Black Friday/Cyber Monday" narrative: that his cell phone was through "Straight Talk," a prepaid cell phone carrier, and that he would "often" upgrade his phone around the time of the Black Friday or Cyber Monday sales. As Mr. Daniels explained at the evidentiary hearing:

35

> Q. And, sir, when you spoke with [Mr. Martinez] in October of 2024, what, if anything, did he tell you about the availability of the text messages at that point?
>
> A. He told me that he often would – his cellphone was through Straight Talk. He would often change phones, sometimes change phone numbers, but he said he would frequently change phones on a Black Friday or Cyber Monday or something like that, maybe get an upgrade on his cellphone.
>
> Q. Did he tell you that had happened back in 2020?
>
> A. Yes, sir.
>
> . . .
>
> Q. Even though he had not told you about changing phones or changing numbers when you first interviewed him in 2020, right?
>
> A. That's right.

*Id.* at 20:11-20, 21:4-6. There is no data in the court record—phone carrier records, device logs, or any other form of contemporaneous documentation—corroborating when Mr. Martinez changed his phone or phone number. The court, then, is left with a shifting story marked by inconsistencies that supports an inference of intent under Rule 37(e)(2).

Third, ACSO's institutional response to the multiple notices concerning the importance of the text messages reinforces the inference of intent. Despite the multiple notifications and formal preservation requests, Defendants presented no evidence that any preservation measures were ever taken. Indeed, Sheriff Valdez knew the morning of December 3, 2020, that the texts could be exculpatory evidence, yet he set in motion a process marked by delays that resulted in the loss of the texts. It was several weeks, at the earliest, before anyone at the ACSO asked Mr. Martinez to provide his phone for examination. In the interim, no one directed Mr. Martinez to preserve texts that both the Sheriff and Undersheriff understood might have constituted exculpatory evidence in a then-pending criminal investigation. And when Mr. Martinez's actions with regard to the texts finally were scrutinized, at least to some extent, by Commander Lattin,

she accepted at face value his claim that there were no texts—without taking steps to verify that claim or to otherwise mitigate the risk of spoliation. The court cannot attribute this conduct to mere negligence, particularly in view of Defendants' status as trained law enforcement professionals who must routinely comply with preservation obligations.

In short, the record before the court demonstrates a response of conscious indifference by Defendants to information strongly suggesting that an ACSO deputy was in possession of texts that could contain exculpatory information in an ongoing criminal case and—by any logical construction of the circumstances—that could be relevant to future civil litigation as well. Such litigation was especially to be anticipated in light of the contemporaneous submission, by Mr. Prescott's counsel, of detailed information concerning his custody rights and documentation describing prior accusations by Ms. Prescott. This record supports the court's finding that Defendants "fully appreciated the significance of the evidence" and "failed to take measure to preserve that relevant evidence." *See SA Int'l, Inc.*, 2025 WL 3487528, at *8 (cleaned up).

The court therefore respectfully finds, as required under Rule 37(e)(2), that Mr. Prescott has met his burden to establish by a preponderance of the evidence that Defendants acted with an intent to deprive him of the use of the texts in the litigation.

### B.    Sanctions

Having found that Defendants engaged in intentional spoliation under Rule 37(e)(2), the court turns to the question of the appropriate sanction to recommend.

Mr. Prescott urges the court to find that "[t]he only sanction for [Defendants'] egregious conduct that is appropriate is entry of a default judgment on liability against the defendants and that is what Plaintiffs request." ECF No. 239 ¶ 38 (citing *Philips Electronics N. Am. Corp. v. BC*

*Technical*, 773 F. Supp. 2d 1149, 1158 (D. Utah 2011) (imposing a default judgment sanction where "[c]ourt orders were disobeyed, documents were intentionally and irretrievably destroyed, efforts were made to erase evidence of the destruction, and BCT employees lied under oath")). The court does not disagree that Defendants' conduct, resulting in the loss of the text messages, is a serious matter. However, upon careful consideration, the court finds that the prejudice to Mr. Prescott may effectively be mitigated by less-severe means than the imposition of the death sentence of a default judgment. Instead, the court concludes that an adverse-inference sanction is appropriate to address the offending conduct.

In so finding, the court begins by rejecting Defendants' contention that the loss of the text messages was a benign event with no impact on Mr. Prescott. *See* ECF No. 234 at 12-13 (arguing that Mr. Prescott has sustained no prejudice attendant on his lack of access to the texts). To be sure, Mr. Prescott, "has read through all of the communications contained" in the text messages existing as of November 29, 2020—when he made the video of the texts Mr. Martinez and Ms. Prescott had exchanged as of that date—but that is beside the point. What Mr. Prescott has not seen are texts that *post-date* November 29, 2020, including any texts that may have been exchanged between Ms. Prescott and Mr. Martinez on the critical date of December 2, 2020, when Ms. Prescott formally accused Mr. Prescott of being a perpetrator of domestic violence, triggering the issuance of a warrant for his arrest, his subsequent arrest, and his confinement in jail for a period of time. The evidence in the record provides ample grounds for the court to infer that Mr. Martinez and Ms. Prescott were texting on December 2, 2020, given that they spoke by phone moments before Ms. Prescott gave her report to Mr. Smith. *See* ECF No. 263-1 at 13. Logically, any texts preceding, or contemporaneous with, Ms. Prescott's report to the ACSO

38

might have revealed information concerning Mr. Martinez's actions and intentions that bear

directly on Mr. Prescott's claims in this lawsuit, including those for malicious prosecution and

false arrest.[16] Viewed in this context, Defendants' assertions that Mr. Prescott "has failed to

show any prejudice whatsoever," and that he has embarked on a "witch hunt" for the missing

texts, ECF No. 234 at 13, are insupportable and utterly belied by the record.

Based on its finding that Defendants intended to deprive Mr. Prescott of the text

messages, the undersigned recommends (1) that Mr. Prescott be permitted to present evidence to

the jury regarding Defendants' failure to preserve the text messages between Mr. Martinez and

Ms. Prescott and the circumstances of the loss of those text messages; (2) that the court give an

adverse-inference instruction at trial that the jury must presume that the information contained in

the spoliated texts was unfavorable to Defendants; and (3) that the court itself presume, for

purposes of any motions filed, that the texts contained unfavorable information for Defendants.

The undersigned is persuaded that this combination of sanctions will adequately address the

prejudice Mr. Prescott has sustained, while facilitating "the judicial system's strong

---

[16] *See Shrum v. Cooke*, 60 F.4th 1304, 1310 (10th Cir. 2023) ("A § 1983 malicious prosecution claim includes five elements," requiring a plaintiff to show that "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the arrest, confinement, or prosecution; (4) the defendant acted maliciously; and (5) the plaintiff sustained damages.") (cleaned up); *Chambers v. Cooper*, No. 13-cv-00393-REB-MEH, 2014 WL 561371, at *8 (D. Colo. Feb. 12, 2014) (recognizing that a plaintiff seeking to prove a false arrest claim under § 1983 must establish that "(1) the defendant intended to restrict the plaintiff's freedom of movement; (2) the plaintiff's freedom of movement was restricted for a period of time, however short, either directly or indirectly, by an act of defendant; and (3) the plaintiff was aware that his freedom of movement was restricted") (citation omitted).

predisposition to resolve cases on their merits[.]" *See Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992).

With regard to the adverse-inference instruction specifically, the court recommends that the jury be instructed in the following manner:

> Evidence has been introduced in this trial of the failure of Defendants—Archuleta County Sheriff's Office personnel, including Sheriff Richard Valdez, Undersheriff Derek Woodman, Operations Commander Roxanne Lattin, and Deputy James Martinez—to comply with their obligations to preserve text messages exchanged between Erika Prescott and Deputy James Martinez that were potentially relevant to the claims or defenses in this case.

> Evidence has also been introduced that these text messages were created, sent, and/or received on Defendant Martinez's cellphone and were deleted or otherwise not preserved after Defendants were placed on notice of the existence of the texts and that they may be relevant to a foreseeable criminal action or civil litigation. You are instructed that federal law requires parties to take reasonable steps to preserve electronically-stored information, including text messages, when they reasonably anticipate that a criminal action or civil litigation is likely.

> You may infer that the text messages between Erika Prescott and Defendant Martinez that Defendants failed to preserve would have been beneficial to Plaintiffs' claims and detrimental to Defendants' defenses.

While the undersigned finds this adverse-inference instruction to be an appropriate sanction based on the present record, the court recognizes that, as information is continued to be received before and during trial, Judge Sweeney may choose to alter or amend this instruction at her discretion.

## CONCLUSION

The court concludes that Defendants had a duty to preserve the text messages; that they failed to take reasonable steps to do so; that the messages have been lost and cannot be restored

or replaced through additional discovery; and that Defendants acted with an intent to deprive

Plaintiff of the use of this evidence in this litigation. Accordingly, consistent with the foregoing

analysis, it is respectfully **RECOMMENDED** that Plaintiffs' Motion for Sanctions for

Spoliation of Evidence be **GRANTED in part** and **DENIED in part**.[17]

DATED: March 5, 2026                         BY THE COURT:

_____
Susan Prose
United States Magistrate Judge

---

[17] Rule 72 of the Federal Rules of Civil Procedure provides that within fourteen (14) days after
service of a Magistrate Judge's order or recommendation, any party may serve and file written
objections with the Clerk of the United States District Court for the District of Colorado.
28 U.S.C. §§ 636(b)(1)(A), (B); Fed. R. Civ. P. 72(a), (b). Failure to make any such objection
will result in a waiver of the right to appeal the Magistrate Judge's order or recommendation. *See
Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 783 (10th Cir. 2021) (firm waiver
rule applies to non-dispositive orders); *but see Morales-Fernandez v. INS*, 418 F.3d 1116, 1119,
1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require
review, including when a "pro se litigant has not been informed of the time period for objecting
and the consequences of failing to object").